T.C. Memo. 2006-97


UNITED STATES TAX COURT


JERRY AND PATRICIA A. DIXON, ET AL.,[1] Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  9382-83, 15907-84,   Filed May 10, 2006.
             40159-84, 30979-85,
             29643-86.


    <u>Henry Binder</u> and <u>John A. Irvine</u>, counsel for petitioners in

docket Nos. 9382-83, 15907-84, 40159-84, and 30979-85.

    <u>Michael Louis Minns</u> and <u>Enid M. Williams</u>, counsel for

petitioners in docket No. 29643-86.

    <u>Henry E. O'Neill</u> and <u>Peter R. Hochman</u>, counsel for

respondent.

_____

    [1] Cases of the following petitioners are consolidated
herewith:  Robert L. and Carolyn S. DuFresne, docket Nos.
15907-84 and 30979-85; Terry D. and Gloria K. Owens, docket No.
40159-84; and Richard and Fiorella Hongsermeier, docket No.
29643-86.

CONTENTS

Page

Background . . . . . . . . . . . . . . . . . . . . . . . . 4

Discussion . . . . . . . . . . . . . . . . . . . . . . . 17

I.   Introduction . . . . . . . . . . . . . . . . . . . . . 17
     A.  Overview of Section 7430 . . . . . . . . . . . . . 17
     B.  Tax Court's Authority To Award Appellate
         Fees Under Section 7430 . . . . . . . . . . . . . 18
     C.  The Other Side of the Coin:  Inapplicability
         of Section 6673(a)(2) and the Bad
         Faith Exception . . . . . . . . . . . . . . . . . 22

II.  Entitlement to Relief Under Section 7430 . . . . . . . 25
     A.  Respondent's Position . . . . . . . . . . . . . . 25
     B.  Paid or Incurred Requirement  . . . . . . . . . . 25
         1.  Overview . . . . . . . . . . . . . . . . . . 25
         2.  Real Parties in Interest . . . . . . . . . . 26
     C.  Substantial Justification Defense . . . . . . . . 29
         1.  Identifying "the Position of the
             United States in the Proceeding" . . . . . . 29
         2.  Substantial Justification Analysis . . . . . 31
     D.  Conclusion  . . . . . . . . . . . . . . . . . . . 33

III. Amount of Award  . . . . . . . . . . . . . . . . . . . 33
     A.  Respondent's Position . . . . . . . . . . . . . . 33
     B.  Applicability of Statutory Rate Cap . . . . . . . 33
         1.  Limited Availability of Qualified Attorneys . 34
         2.  Local Availability of Tax Expertise . . . . . 36
         3.  Difficulty of the Issues . . . . . . . . . . 36
         4.  Other Possible Special Factors  . . . . . . . 37
             a.  In General  . . . . . . . . . . . . . . . 37
             b.  The Government's Misconduct  . . . . . . 38
             c.  The Delay Factor . . . . . . . . . . . . 41
             d.  Test Case Status . . . . . . . . . . . . 44
         5.  Conclusion . . . . . . . . . . . . . . . . . 45
     C.  Compensable Hours . . . . . . . . . . . . . . . . 45
         1.  Respondent's Objections . . . . . . . . . . . 45
             a.  Duplicative Fees Due to Change of
                 Counsel . . . . . . . . . . . . . . . . . 45
             b.  Overstaffing  . . . . . . . . . . . . . . 46
             c.  Porter & Hedges Client Conferences  . . . 48
         2.  Additional Adjustments to Time Claimed for the
             Appeals  . . . . . . . . . . . . . . . . . . 49
             a.  Missing Minns Time Entries  . . . . . . . 49

             b.    Minns Hours Relating to Dispute With
                   Committee . . . . . . . . . . . . . . . .   50
             c.    Additional Porter & Hedges Time Relating
                   to Minns Dispute  . . . . . . . . . . . .   50
             d.    Porter & Hedges Time Relating to
                   Bill of Costs . . . . . . . . . . . . . .   51
             e.    Porter & Hedges Time Relating to Remand .  51
      3.     Adjustments to Porter & Hedges Time
             Relating to Fee Request  . . . . . . . . . . .   51
             a.    Initial Research Time . . . . . . . . . .  51
             b.    Time Relating to Unsuccessful Claims  . .  52
   D.  Computation of Potentially Compensable Fees . . . .   55
      1.     The Hongsermeiers--Work on the Appeal  . . . .   55
             a.    2001  . . . . . . . . . . . . . . . . . .  55
             b.    2002  . . . . . . . . . . . . . . . . . .  56
             c.    Total . . . . . . . . . . . . . . . . . .  57
      2.     The Hongsermeiers--Work on the Fee Request      57
             a.    2003 to 2005  . . . . . . . . . . . . . .  57
             b.    2006  . . . . . . . . . . . . . . . . . .  57
             c.    Application of Limited Success Factor . .  57
      3.     The PH Petitioners . . . . . . . . . . . . . .   59
             a.    2001  . . . . . . . . . . . . . . . . . .  59
             b.    2002 to 2005  . . . . . . . . . . . . . .  60
             c.    2006  . . . . . . . . . . . . . . . . . .  61
             d.    Total . . . . . . . . . . . . . . . . . .  61
   E.  Potentially Compensable Expenses  . . . . . . . . .   62
   F.  Amounts Paid or Incurred by Eligible Persons  . . .   62
      1.     Amounts Paid Through the Defense Fund  . . . .   63
             a.    Minns Agreement . . . . . . . . . . . . .  63
             b.    Porter & Hedges Agreement . . . . . . . .  66
      2.     Amounts Paid Directly to Minns  . . . . . . .    68
      3.     Amounts Incurred But Not Paid . . . . . . . .    68
      4.     Summary . . . . . . . . . . . . . . . . . . .    69
   G.  Final Figures . . . . . . . . . . . . . . . . . . .    69

IV.  Interest . . . . . . . . . . . . . . . . . . . . . . .   70

Appendix A--September 1, 2005 Order . . . . . . . . . . . .   72

Appendix B--September 8, 2005 Order . . . . . . . . . . . .   78

Appendix C--November 18, 2005 Order . . . . . . . . . . . .   84

## MEMORANDUM OPINION

BEGHE, Judge:  These cases are before the Court on separate
remand from the Court of Appeals for the Ninth Circuit.  In this
opinion, we address petitioners' requests for appellate

attorney's fees and expenses under section 7430,[2] originally filed with the Court of Appeals in the aftermath of <u>Dixon v. Commissioner</u>, 316 F.3d 1041 (9th Cir. 2003), revg. and remanding T.C. Memo. 1999-101.

<u>Background</u>[3]

Petitioners (the Dixons, DuFresnes, Owenses, and Hongsermeiers) are, along with one other couple--the Youngs--the remaining test case petitioners in the Kersting tax shelter litigation. That litigation arose from respondent's disallowance of interest deductions claimed by participants in various tax shelter programs promoted by Henry F.K. Kersting during the late 1970s through the 1980s. Under the test case procedure, most of the other Kersting program participants who had filed Tax Court petitions ("nontest case petitioners") entered into "piggyback" agreements in which they agreed that their cases would be resolved in accordance with the Court's opinion in the test cases.[4] Eventually, more than 300 nontest case petitioners made

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] The following background statement is based on the existing record and additional information submitted by the parties in connection with the appellate fee requests. We have not found it necessary to hold an evidentiary hearing. See Rule 232(a)(2).

[4] Upon the final disposition of the test cases, the relatively few nontest case petitioners who did not enter into piggyback agreements will generally be ordered to show cause why their cases should not be decided in the same manner as the test cases.

periodic and/or lump sum contributions to a fund (hereafter, the "Defense Fund" or "Fund") created to share the cost of the test case litigation.[5]

Following a 3-week trial, the Court sustained virtually all of respondent's determinations in each of the test cases. See Dixon v. Commissioner, T.C. Memo. 1991-614 (Dixon II).[6] Shortly thereafter, on June 9, 1992, respondent notified the Court that, prior to the trial of the test cases, respondent's trial attorney, Kenneth W. McWade (McWade), and his supervisor, Honolulu District Counsel William A. Sims (Sims), had entered into contingent settlement agreements with two of the test case petitioners (the Thompsons and the Cravenses) and had failed to disclose those agreements to their superiors, to the Court, or to the other test case petitioners or their counsel. Respondent asked the Court to conduct an evidentiary hearing to determine whether the undisclosed agreements had affected the trial of the test cases or the opinion of the Court. The Court denied respondent's request for an evidentiary hearing, entered decisions giving effect to the Thompson and Cravens settlements, and reentered or allowed to stand the decisions sustaining

---

[5] The Defense Fund was initially known as the Don Belton Legal Defense Fund and subsequently became known as the Atlas Legal Defense Fund.

[6] Prior to the trial of the test cases, the Court had issued an opinion rejecting the test case petitioners' arguments that certain evidence should be suppressed and that the burden of proof should be shifted to respondent. See Dixon v. Commissioner, 90 T.C. 237 (1988) (Dixon I).

respondent's determinations against the other test case petitioners.

On appeal, the Court of Appeals for the Ninth Circuit, citing Arizona v. Fulminante, 499 U.S. 279, 309 (1991), stated:

> We cannot determine from this record whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error. [DuFresne v. Commissioner, 26 F.3d 105, 107 (9th Cir. 1994) (per curiam), vacating Dixon v. Commissioner, T.C. Memo. 1991-614.]

The Court of Appeals vacated the Court's decisions in the test cases (other than the Thompson and Cravens cases) and remanded them for "an evidentiary hearing to determine the full extent of the admitted wrong done by the government trial lawyers." Id. In response to the direction of the Court of Appeals to consider on the merits all motions of intervention filed by interested parties, this Court ordered that the cases of 10 nontest case petitioners (hereafter, the participating nontest case petitioners) be consolidated with the remaining test cases for purposes of the evidentiary hearing. One of the participating nontest case petitioners was represented by Joe Alfred Izen, Jr. (Izen), who had represented the test case petitioners (other than the Thompsons and Cravenses) at the original trial; the others were represented by either Robert Alan Jones (Jones) or Robert Patrick Sticht (Sticht).

On the basis of the record developed at the evidentiary hearing, the Court held that the misconduct of the Government

attorneys in the trial of the test cases did not constitute a structural defect in the trial but rather resulted in harmless error. See Dixon v. Commissioner, T.C. Memo. 1999-101 (Dixon III). However, the Court imposed sanctions against respondent, holding that Kersting program participants who had not had final decisions entered in their cases would be relieved of liability for (1) the interest component of the addition to tax for negligence under former section 6653(a), and (2) the incremental interest attributable to the increased rate prescribed in former section 6621(c).

After the issuance of Dixon III, the remaining test case petitioners, all of whom were still represented by Izen, and some of the participating nontest case petitioners filed motions for attorney's fees and costs (the initial fee requests), relying primarily on sections 7430 and 6673. The Court ordered the movants to submit documentation pertaining to fees and expenses incurred commencing June 10, 1992 (i.e., the day after the Court learned of the misconduct by the Government attorneys). In Dixon v. Commissioner, T.C. Memo. 2000-116 (Dixon IV), the Court rejected the initial fee requests insofar as they relied on section 7430, on the ground that the movants had not substantially prevailed on the merits as required by section 7430(c)(4)(A)(i). However, the Court awarded a portion of the claimed fees and expenses under section 6673(a)(2)(B) (relating

to misconduct of the Commissioner's attorneys in Tax Court proceedings).

The Court entered decisions in the remaining test cases and certified the cases of the participating nontest case petitioners for interlocutory appeal. Izen filed notices of appeal on behalf of the remaining test case petitioners, and he also filed an interlocutory appeal on behalf of Norman and Barbara Adair, the participating nontest case petitioners he represented.[7] Izen purported to file his interlocutory appeal on behalf of not only the Adairs, but also on behalf of nontest case petitioners in more than 450 docketed cases who had not participated in the evidentiary hearing and therefore were not included in this Court's certification order.

In January 2001, the Defense Fund, acting through a five-person "steering committee", retained attorney Michael Louis Minns (Minns) to replace Izen. Under the Minns retainer agreement, the Defense Fund agreed to pay Minns an up-front, nonrefundable fee of $110,000, while Minns agreed to a maximum fee for his firm of $150,000. The Fund also agreed to a $75,000 fee for Lawfinders Associates, Inc. (Lawfinders), a firm hired by Minns to assist in researching and writing his appellate briefs. Although Minns replaced Izen as counsel of record for the Dixons,

---

[7] Jones and Sticht filed interlocutory appeals on behalf of the other participating nontest case petitioners.

DuFresnes, Owenses, and Hongsermeiers, Izen remained counsel of record for the Youngs, the only other remaining test case petitioners.

In January and February 2001, the Hongsermeiers and 112 nontest case petitioners (hereafter, the group of 112) made contributions to the Defense Fund (all but two in the amount of $1,500) totaling $168,600 in connection with the hiring of Minns. In addition, from January 2001 through November 2001 (the last full month during which the steering committee recognized Minns as the Fund's counsel), the Hongsermeiers and 106 members of the group of 112 made smaller contributions to the Defense Fund totaling $99,600. Thus, total contributions to the Defense Fund by the Hongsermeiers and the group of 112 from January 2001 through November 2001 amounted to $268,200. The Fund paid the aforementioned fees of $110,000 and $75,000 to Minns and Lawfinders, respectively, in early 2001.[8]

The steering committee became dissatisfied with Minns, and by letter dated December 7, 2001, the Defense Fund formally requested Porter & Hedges, L.L.P. (Porter & Hedges) to take over the appeals and to represent the Fund in "the anticipated litigation involving our former attorney in this matter, Michael Minns." The ensuing engagement letter confirms that Porter &

---

[8] The Fund paid other amounts under the Minns agreement, including a $20,000 fee to an accounting firm, for which the Hongsermeiers do not seek recovery.

Hedges, in addition to the appellate work, would "represent the Committee with regard to counsel and assistance in terminating its relationship with its present lawyer, Michael Louis Minns, and * * * assist * * * in obtaining a refund of attorneys' fees and expenses paid to Mr. Minns or at his direction". The engagement is on an hourly fee basis, with the Defense Fund agreeing to advance $120,000 for application against expected billings. Three members of the steering committee--all nontest case petitioners--are jointly and severally liable for the Defense Fund's obligations under the agreement, which are not limited by the $120,000 estimate and required advance.

From December 12, 2001 to April 5, 2002, the Dixons and 43 nontest case petitioners (hereafter, the group of 43)--36 of whom are also part of the group of 112--made contributions to the Defense Fund (all but three in the amount of $1,500) totaling $66,050 in connection with the hiring of Porter & Hedges. In addition, from December 2001 through April 2002, 37 members of the group of 43 made smaller contributions to the Defense Fund totaling $18,150. Thus, total contributions to the Defense Fund from December 2001 through April 2002 by the Dixons and the group of 43 amounted to $84,200. Porter & Hedges has received only $60,000 from the Defense Fund to date, with the last payment occurring in April 2002.

Although Porter & Hedges attorneys Henry Binder (Binder) and John A. Irvine (Irvine) entered appearances in the Court of Appeals on behalf of the Dixons, DuFresnes, and Owenses, Minns remained counsel of record for the Hongsermeiers. Thus, three sets of counsel pursued the appeals of the test cases: Izen on behalf of the Youngs, Minns on behalf of the Hongsermeiers, and Porter & Hedges on behalf of the Dixons, DuFresnes, and Owenses (hereafter, the PH petitioners).

The Court of Appeals reversed and remanded, holding that the misconduct of the Government attorneys in the trial of the test cases was a fraud on the court, for which no showing of prejudice is required. See Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V); see also Dixon v. Commissioner, T.C. Memo. 2006-90 (Dixon VI) (determining the parameters of the illicit Thompson settlement and extending the benefit thereof to all remaining Kersting project petitioners in accordance with the mandate of the Court of Appeals in Dixon V). After the issuance of Dixon V, a group comprising the Hongsermeiers and 38 nontest case petitioners--35 of whom are also part of the group of 112 and three of whom are part of the group of 112 and the group of 43-- retained Minns to continue representing their interests in post-appellate matters (including this fee litigation). The Hongsermeiers and each member of the group of 38 paid Minns a $3,500 retainer fee.

Shortly after the issuance of Dixon V, the Hongsermeiers and the PH petitioners filed separate requests with the Court of Appeals for attorney's fees incurred on appeal. The Hongsermeiers' request relates solely to services performed by Minns and Lawfinders, and the PH petitioners' request relates solely to services performed by Porter & Hedges. As filed, both appellate fee requests relied exclusively on section 7430.

Rather than filing a fee request with the Court of Appeals on behalf of the Youngs, Izen objected to petitioners' fee requests.[9] Izen's primary objection was that petitioners had not paid or incurred the amounts requested:

> In actuality, Mr. Binder's motion fails to reveal the true clients in interest who have paid him fees to represent their interests on appeal. These "real clients in interest" are the same clients represented by Joe Alfred Izen, Jr. in the appeal styled Barbara L. Adair, Et Al, v. Commissioner * * *.

---

[9] Izen is not the only attorney in these proceedings who was, at least initially, hostile to petitioners' appellate fee requests. In a filing relating to the evidentiary hearing required to implement the primary mandate of Dixon V, Jones (who would subsequently file his own appellate fee request on behalf of the participating nontest case petitioners he represents, see infra note 12) remarked:

> Test case counsel, exclusive of Mr. Izen, charged clients in excess of $500,000 to copy Mr. Izen's, Mr. Jones', and Mr. Sticht's prior work from the evidentiary hearing [held in 1996 and 1997] without adding one new idea which had a substantial effect on the Dixon appeal. These taxpayers cannot afford to pay expensive lawyers by the hour in order to get the relief they so justly deserve.

Izen then filed a motion in the Adairs' interlocutory appeal to transfer consideration of attorney's fees on appeal to the Tax Court. See 9th Cir. R. 39-1.8. Although the Court of Appeals promptly granted the motion, Izen waited more than 2 years to file his appellate fee request with this Court. That fee request is currently pending and will be the subject of a later opinion. See infra note 12.

On May 28, 2003, the Court of Appeals, acting through the panel that had decided Dixon V, issued the following order in response to petitioners' appellate fee requests:

> Appellants' request for attorneys' fees on appeal is remanded to the Tax Court for a determination of entitlement and, if warranted, amount. Although not required by this order, an evidentiary hearing may aid the Tax Court in making this determination. The panel retains jurisdiction over all further proceedings that may arise.

Thereafter, petitioners' counsel attempted, unsuccessfully, to retrieve from the Court of Appeals the documents relative to the appellate fee requests. Petitioners' counsel and respondent's counsel eventually filed in this Court a Special Stipulation of Facts Concerning Appellants' Request for Attorneys' Fees on Appeal (the stipulation), stipulating the authenticity of the appellate fee requests and all related objections, oppositions, replies, and records attached as exhibits to the stipulation. Petitioners have largely pursued their appellate fee requests in this Court on a joint basis.

In considering the appellate fee requests, we solicited the parties' views as to whether we were limited to section 7430, cited in their requests, or were instead free to proceed under section 6673(a)(2), on which we relied in Dixon IV.[10]  In a May 2005 order, we expressed the view that "there are substantial obstacles to awarding appellate fees and costs under section 6673(a)(2)".  Shortly thereafter, the Youngs filed a motion in this Court for attorney's fees under section 6673 relating to services performed (and expenses incurred) by Izen on appeal.

In August 2005, the PH petitioners amended their appellate fee request to assert entitlement under the "bad faith" exception to the so-called American rule (hereafter, the bad faith exception), while continuing to rely on section 7430 as an alternative ground.[11]  By the amendment, the PH petitioners also seek interest on the requested fees and expenses from January 17, 2003 (the date of the Court of Appeals' Dixon V opinion).

In an order dated September 1, 2005, which we incorporate by reference and reproduce as Appendix A, we concluded that "the

---

[10] Sec. 7430 contains certain conditions and limitations that do not apply to fee awards under sec. 6673(a)(2).  See infra Parts I.A., I.C.

[11] The American rule generally prohibits a Federal court from awarding attorney's fees in the absence of a statute or contract providing for a fee award.  Chambers v. NASCO, Inc., 501 U.S. 32, 61 (1991) (Kennedy, J., dissenting) (citing Alyeska Pipeline Serv. Co. v. Wilderness Socy., 421 U.S. 240, 258-259 (1975)).

principles enunciated in <u>Cooter & Gell v. Hartmarx Corp.</u>, [496 U.S. 384 (1990),] preclude us from awarding appellate fees and expenses under the bad faith exception to the American rule". Having determined to proceed under section 7430, and with a nod to Izen's previous objection, we ordered petitioners to submit net worth affidavits for all real parties in interest with respect to their appellate fee requests; namely, "those individuals who have made payments to Porter & Hedges or Michael Minns, P.L.C.--through contributions to the Atlas Legal Defense Fund or otherwise--or are liable to Porter & Hedges or Michael Minns, P.L.C. for the unpaid portion of the requested fees and expenses".  See Rule 231(b)(4); see also <u>infra</u> Part I.A. Meanwhile, in an order dated September 8, 2005, which we incorporate by reference and reproduce as Appendix B, we similarly rejected the Youngs' reliance on section 6673 and ordered them to submit net worth affidavits for all real parties in interest.[12]

On November 7, 2005, the PH petitioners filed a motion for reconsideration of our September 1 order, as well as a separate

---

[12] That order also pertains to a motion for appellate fees and expenses filed in this Court in July 2005 by the participating nontest case petitioners represented by Jones.  We subsequently informed the parties that we would handle that motion and the Youngs' appellate fee motion (filed by Izen) separately from petitioners' appellate fee requests.  To complete the story regarding appellate fee requests, the Court understands that Sticht and respondent are working on a comprehensive stipulation and submission regarding requests for fees by participating nontest case petitioners represented by Sticht.

motion for appellate attorney's fees under section 6673. We denied the motion for reconsideration by order dated November 18, 2005, which we incorporate by reference and reproduce as Appendix C. We separately denied the PH petitioners' motion for fees under section 6673 "[f]or the reasons discussed in our Order dated September 8, 2005" (App. B).

The Hongsermeiers claim attorney's fees of $276,434.75, based on (1) 930.32 hours devoted to the appeal and 278.75 hours devoted to the fee request,[13] and (2) rates ranging from $50 to $300 per hour. They have not requested any expenses other than attorney's fees.

The PH petitioners claim attorney's fees of $494,514.75, based on (1) 1,157.65 hours devoted to the appeal and 734.1 hours devoted to the fee request, and (2) rates ranging from $90 to $460 per hour.[14] They also claim other expenses of $20,307.15.

---

[13] Respondent does not dispute that fees relating to work on a fee request ("fees for fees" or "fees on fees") are potentially recoverable under sec. 7430. See, e.g., Huffman v. Commissioner, 978 F.2d 1139, 1149 (9th Cir. 1992), affg. in part and revg. in part on other grounds T.C. Memo. 1991-144.

[14] Both fee requests include legal assistant or paralegal fees. Although sec. 7430 does not specifically provide for the recovery of such fees, this Court has routinely awarded them, see, e.g., Foothill Ranch Co. Pship. v. Commissioner, 110 T.C. 94, 101-102 (1998), and we have no reason to believe that the Court of Appeals for the Ninth Circuit would take a different approach. Cf. Commissioner, INS v. Jean, 496 U.S. 154, 163 n.10 (1990) (Equal Access to Justice Act (EAJA) case; Court's hypothetical refers to paralegal fees even though the EAJA, from which sec. 7430 derives, does not specifically refer to such fees); Sorenson v. Mink, 239 F.3d 1140, 1144 (9th Cir. 2001)

(continued...)

Discussion

I. Introduction

  A. Overview of Section 7430

Section 7430 provides that, subject to certain conditions, a taxpayer who prevails against the Government in any Federal tax proceeding (administrative or judicial) may recover reasonable costs, including attorney's fees, paid or incurred in connection with such proceeding if the Government's position in the proceeding was not substantially justified. Sec. 7430(a), (c)(1)(B)(iii), (c)(4)(A) and (B). In its report accompanying the bill in which section 7430 originated, the House Committee on Ways and Means contemplated that such fee awards "will enable individual taxpayers to vindicate their rights regardless of their economic circumstances." H. Rept. 97-404, at 11 (1981).

A taxpayer seeking litigation costs under section 7430 must have exhausted all available administrative remedies prior to litigation, must not have unreasonably protracted the proceedings, and, if an individual, must not have had a net worth in excess of $2 million as of the filing date of the suit. Sec. 7430(b)(1), (b)(3), (c)(4)(A)(ii); see 28 U.S.C. sec. 2412(d)(2)(B)(i) (1988) (individual net worth limitation

_____

[14](...continued)
(EAJA fee application included legal assistant fees; no discussion of the issue). Although legal assistant and paralegal fees do not fit neatly within the category of either "attorney's fees" or "expenses", we follow petitioners' lead in grouping them with attorney's fees.

contained in the Equal Access to Justice Act and incorporated by reference in sec. 7430(c)(4)(A)(ii)).  Reasonable attorney's fees may not exceed the rate of $125 per hour (as adjusted for inflation) unless "a special factor, such as the limited availability of qualified attorneys for such proceeding, the difficulty of the issues presented in the case, or the local availability of tax expertise, justifies a higher rate."  Sec. 7430(c)(1)(B)(iii).[15]

Respondent publishes the inflation-adjusted rate cap on an annual basis.  The hourly rate cap for fees incurred in 2001 (the earliest year for which petitioners claim fees) is $140.  Rev. Proc. 2001-13, 2001-1 C.B. 337, 341.  The hourly rate cap for fees incurred between 2002 and 2005 is $150.  Rev. Proc. 2001-59, 2001-2 C.B. 623, 628; Rev. Proc. 2002-70, 2002-2 C.B. 845, 850; Rev. Proc. 2003-85, 2003-2 C.B. 1184, 1190; Rev. Proc. 2004-71, 2004-2 C.B. 970, 976.  The hourly rate cap for fees incurred in 2006 is $160.  Rev. Proc. 2005-70, 2005-47 I.R.B. 979, 985.

B.    Tax Court's Authority To Award Appellate
      Fees Under Section 7430

Before we evaluate petitioners' appellate fee requests under section 7430, we address the threshold issue of our authority to

---

[15] The latter two examples of special factors were added by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3101(a)(2), 112 Stat. 727, effective for costs incurred after Jan. 18, 1999, id. sec. 3101(g), 112 Stat. 729.  All of the costs sought by petitioners were incurred after Jan. 18, 1999.

award appellate fees under that section.[16] We begin by observing that the Court of Appeals cannot independently empower us to make such an award. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 409 (1990) (reversing that portion of Court of Appeals' judgment remanding the case to District Court for award of appellate attorney's fees as part of Rule 11[17] sanction; that rule does not authorize District Courts to award attorney's fees incurred on appeal). Having said that, we are satisfied that section 7430, unlike the provision at issue in Cooter & Gell, authorizes trial courts (such as the Tax Court) to award litigation costs incurred on appeal.

Our conclusion that we may award appellate fees under section 7430 ultimately rests on the distinction between (1) fee awards (such as those under section 7430) authorized under "fee-shifting rules that embody a substantive policy, such as a

---

[16] We are hesitant to phrase the issue (i.e., whether we can award appellate litigation costs under sec. 7430) in terms of our "jurisdiction". See Scarborough v. Principi, 541 U.S. 401, 414 (2004) (Equal Access to Justice Act does not describe what "classes of cases" the Court of Appeals for Veterans Claims is competent to adjudicate; rather, it relates only to postjudgment proceedings auxiliary to cases already within that court's adjudicatory authority); see also Kafka & Cavanagh, Litigation of Federal Civil Tax Controversies, par. 2.01[5], at 2-8 (2d ed. 1997) (Tax Court's "jurisdiction" to consider a motion for litigation costs is part and parcel of its jurisdiction over the underlying action); cf. Rule 270(c) (recognizing that the Tax Court's jurisdiction to review an administrative denial of administrative costs derives from sec. 7430(f)(2)).

[17] References to Rule 11 are to Rule 11 of the Federal Rules of Civil Procedure.

statute which permits a prevailing party in certain classes of litigation to recover fees", Chambers v. NASCO, Inc., 501 U.S. 32, 52 (1991), and (2) fee awards (such as those under Rule 11, the bad faith exception, or section 6673(a)(2)) that serve as sanctions, the imposition of which "depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation", Chambers v. NASCO, Inc., supra at 53 (drawing the distinction in the context of the Erie doctrine as applied to the bad faith exception). See also Bus. Guides, Inc. v. Chromatic Commcns. Enters., Inc., 498 U.S. 533, 553 (1991) (Rule 11 sanctions, which "are not tied to the outcome of [the] litigation", "do not constitute the kind of fee shifting at issue in Alyeska [Pipeline Serv. Co. v. Wilderness Socy., 421 U.S. 240 (1975)]."[18] In Cooter & Gell v. Hartmarx Corp., supra at 409, the Supreme Court expressly recognized this distinction in the context of appellate fees: "As Rule 11 is not a fee-shifting statute, the policies for allowing district courts to require the losing party to pay appellate, as well as District Court attorney's fees, are not applicable."

_____

[18] The "kind of fee shifting at issue in Alyeska" involved the substantive policy of encouraging private parties "to bring suit to further broad public interests" such as protecting the environment, i.e., under the "private attorney general" theory. Wilderness Socy. v. Morton, 495 F.2d 1026, 1034 (D.C. Cir. 1974), revd. sub nom. Alyeska Pipeline Serv. Co. v. Wilderness Socy., 421 U.S. 240 (1975).

The foregoing dictum from Cooter & Gell regarding the authority of District Courts to award appellate attorney's fees under fee-shifting statutes is consistent with the Supreme Court's approach in Commissioner, INS v. Jean, 496 U.S. 154 (1990), issued 1 week prior to Cooter & Gell. In Jean, the Court held that the recipient of a fee award under the Equal Access to Justice Act (EAJA), the fee-shifting statute from which section 7430 derives, may recover fees incurred litigating the fee award without a separate showing that the Government's opposition to the fee award was not substantially justified. See Commissioner, INS v. Jean, supra at 159 ("only one threshold [substantial justification] determination for the entire civil action is to be made"). In so holding, the Court observed that while "[a]ny given civil action can have numerous phases", "the EAJA--like other fee-shifting statutes--favors treating a case as an inclusive whole". Id. at 161-162.[19] To interpret a fee-shifting statute such as the EAJA or section 7430 as not authorizing a trial court to award appellate attorney's fees would be

---

[19] The Court also noted that the EAJA "refers to an award of fees 'in any civil action' without any reference to separate parts of the litigation, such as discovery requests, fees, or appeals." Commissioner, INS v. Jean, 496 U.S. at 159 (emphasis added). Similarly, sec. 7430(a)(2) refers to "costs incurred in connection with such [tax-related] court proceeding", and sec. 7430(c)(6) defines "court proceeding" as "any civil action brought in a court of the United States" (including the Tax Court), without any reference to separate phases of the proceeding.

inconsistent with the unitary approach espoused by the Court in Jean.[20]

   C.   The Other Side of the Coin:  Inapplicability
        of Section 6673(a)(2) and the Bad Faith Exception

The distinction between fee-shifting provisions and fee sanctions also informs our prior refusals to evaluate petitioners' appellate fee requests under either section 6673(a)(2) or the bad faith exception, each of which falls into the fee sanction category.  See Apps. A, B, C.  In contrast to the unitary approach adopted in the fee-shifting (EAJA) case of Commissioner, INS v. Jean, 496 U.S. at 159, under which "only one threshold [substantial justification] determination for the entire civil action is to be made", the Supreme Court adopted a "direct causation" approach 1 week later in Cooter & Gell v. Hartmarx Corp., supra, a case involving a fee sanction under Rule 11.  There, the Court rejected the argument that the reference in Rule 11 (as then in effect) to fees and expenses incurred "because of" the offending filing included fees incurred in defending a District Court's Rule 11 sanction on appeal:  "We

---

[20] If the authority to award appellate fees under the EAJA or sec. 7430 resided exclusively in the appellate courts, then there would be two "substantial justification" determinations whenever an appellate court, applying the (deferential) abuse of discretion standard, see Pierce v. Underwood, 487 U.S. 552, 557–563 (1988), upholds the trial court's determination in that regard (i.e., with respect to an EAJA or sec. 7430 fee request pertaining to trial fees), but reaches the opposite conclusion in disposing of a similar request for appellate fees in the same case.

believe Rule 11 is more sensibly understood as permitting an award only of those expenses directly caused by the [sanctionable] filing, logically, those at the trial level." Cooter & Gell v. Hartmarx Corp., 496 U.S. at 406. Thus, while Jean contemplates that the recipient of an EAJA fee award may recover fees incurred in defending the award on appeal without a separate showing that the Government's appeal of the award was not substantially justified, the Court in Cooter & Gell concluded that a litigant defending a Rule 11 fee award on appeal may recover appellate expenses "only when those expenses are caused by a frivolous appeal, and not merely because a Rule 11 sanction upheld on appeal can ultimately be traced to a baseless filing in district court." Id. at 407.

The foregoing dichotomy suggests that a litigant who is entitled to attorney's fees at the trial level on the basis of his opponent's misconduct must, in the absence of additional sanctionable conduct at the appellate level, premise any claim for appellate fees on a fee-shifting (prevailing party) provision. Because some fee-shifting provisions impose restrictions (such as hourly rate caps) that may not apply to fee sanctions, such a litigant may find that his claims for attorney's fees incurred during the trial and appellate phases, respectively, of the same litigation are subject to markedly different rules. That is the case here. Under section 6673(a)(2), we are authorized to sanction respondent for the

attorney misconduct that marred the test case trial by charging him the full amount of petitioners' attorney's fees relating to the Tax Court proceedings necessitated by that misconduct, subject only to the requirement that such amounts have been reasonably incurred.[21]  Because that misconduct did not extend to the appellate proceedings, petitioners are relegated to the applicable fee-shifting provision--section 7430, with its hourly rate cap and eligibility requirements--with regard to their appellate fee requests.[22]  Cf. <u>Hutto v. Finney</u>, 437 U.S. 678, 689 & n.13, 693 & n.21 (1978) (Court separately analyzes fee awards ordered by the District Court and the Court of Appeals, respectively; whereas the trial court's award was adequately supported by its finding of bad faith, the appellate court's award, not supported by any finding of bad faith at the appellate level, could only be sustained under the Civil Rights Attorneys

---

[21] Specifically, sec. 6673(a)(2)(B) provides that, whenever respondent's attorneys have unreasonably and vexatiously multiplied proceedings in this Court, the Court may require the United States to pay the excess attorney's fees and other litigation costs reasonably incurred because of such conduct. Although we imposed substantial percentage reductions in our fee awards under sec. 6673(a)(2) in Dixon IV, those reductions were attributable to counsel's various failures to substantiate their claims in their entirety.

[22] We note further that (1) sec. 6673(a)(2) by its terms appears to be limited to Tax Court proceedings, and (2) inasmuch as petitioners filed their appellate fee requests with the Court of Appeals under sec. 7430, our evaluation of those requests under sec. 6673(a)(2) or the bad faith exception arguably would be outside the scope of the Court of Appeals' mandate.  Cf. <u>Pollei v. Commissioner</u>, 94 T.C. 595 (1990).

Fees Awards Act of 1976 (CRAFAA), see 42 U.S.C. sec. 1988 (2000), a fee-shifting statute designed to encourage private enforcement of civil rights laws).

## II. Entitlement to Relief Under Section 7430

### A. Respondent's Position

Respondent contends that petitioners are not entitled to any relief under section 7430 because (1) they have failed to demonstrate that they "paid or incurred" the claimed fees and expenses, and (2) respondent's position on appeal was substantially justified.

### B. Paid or Incurred Requirement

#### 1. Overview

Unlike certain other fee-shifting statutes, section 7430 generally allows the recovery of attorney's fees only to the extent such amounts have been paid or incurred.[23]  Sec. 7430(a)(2), (c)(1)(B)(iii); see Frisch v. Commissioner, 87 T.C. 838, 844 (1986) (distinguishing CRAFAA, under which a court "may allow the prevailing party * * * a reasonable attorney's fee"); cf. Blanchard v. Bergeron, 489 U.S. 87, 96 (1989) (fee award under CRAFAA is not limited to the amount the prevailing party owes his attorney pursuant to contingent fee agreement).  For purposes of section 7430, fees are "incurred" when there is a legal obligation to pay them.  E.g., Grigoraci v. Commissioner,

---

[23] But see sec. 7430(c)(3)(B), providing an exception for pro bono services.

122 T.C. 272, 277-278 (2004).  In that regard, respondent notes that none of the steering committee members who are jointly and severally liable for the Defense Fund's obligations to Porter & Hedges is a party to the PH petitioners' fee request.  Similarly, respondent asserts that "[t]he Hongsermeiers have failed to show that they, as opposed to the Atlas Legal Defense Fund and/or its Steering Committee members, are personally liable for" Minns's fees.  Respondent further complains that the appellate fee requests are devoid of any evidence regarding the existence or amounts of petitioners' contributions to the Defense Fund.[24]

### 2.  Real Parties in Interest

Under the "real party in interest" approach we adopted in our September 1, 2005 order (App. A), the fact that petitioners have not, by and large, paid or incurred the claimed fees and expenses does not render those amounts unrecoverable under section 7430.  As one commentator has recognized in the context of the EAJA, even though that statute "states plainly that the award is to be made to the 'prevailing party'", "[t]his is not to say that the party named in the lawsuit is invariably the true litigant to whom an award is due."  Sisk, "The Essentials of the

---

[24] Petitioners subsequently submitted schedules prepared by the business manager of the Defense Fund indicating that the Hongsermeiers and the Dixons contributed $3,900 and $3,000, respectively, to the Defense Fund during the years 2000-2003. Respondent does not suggest that contributions to the Defense Fund cannot qualify as amounts paid for purposes of sec. 7430. Cf. Grason Elec. Co. v. NLRB, 951 F.2d 1100, 1106 (9th Cir. 1991) (suggesting that fees requested under EAJA may have been paid through contributions to multiemployer association).

Equal Access to Justice Act:  Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part One)," 55 La. L. Rev. 217, 343 (1994); see, e.g., <u>Grason Elec. Co. v. NLRB</u>, 951 F.2d 1100 (9th Cir. 1991) (real parties in interest in EAJA case included all 48 members of multiemployer collective bargaining association who financed the litigation, not just the 6 members who were parties to the litigation).  The case for looking beyond the named parties is particularly compelling in these proceedings, where similarly situated taxpayers not only shared the costs of the litigation but also "had rights at stake in the case on the merits".  Sisk, <u>supra</u> at 346 (arguing that one can be a real party in interest with respect to an EAJA fee request--and thereby potentially entitled to recover the requested fees--only by virtue of one's status as a real party in interest in the underlying litigation on the merits; i.e., that financial responsibility for the claimed legal fees does not confer real party in interest status).[25]

We now hold that the real parties in interest in this litigation include not only the test case petitioners and participating nontest case petitioners, but also all other

---

[25] Conversely, Professor Sisk reasons, a real party in interest who has no financial responsibility for legal fees cannot recover those fees under the EAJA for the simple reason that such person has not "incurred" any fees as required by the statute.  Sisk, "The Essentials of the Equal Access to Justice Act:  Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part One)," 55 La. L. Rev. 217, 346-347 (1994).

remaining nontest case petitioners.[26]    Accordingly, the relevant

inquiry is not whether petitioners paid or incurred the claimed

fees and expenses, but whether the real parties in interest who

did pay or incur those amounts satisfy the net worth requirement

---

[26] It could be argued that only those nontest case petitioners who are bound by the outcome of this litigation, i.e., those who entered into piggyback agreements, should be considered real parties in interest.  Cf. Mearkle v. Commissioner, 90 T.C. 1256, 1261 & n.6 (1988) (refusing to fully reimburse petitioners' claimed litigation costs when those costs clearly related to cases of similarly situated taxpayers--Amway distributors--as well; Court notes that "this case is not a 'test case' which the parties and the Court agree to litigate in order to resolve an issue affecting many other taxpayers who agree to be bound by the result therein").  (Emphasis added.)  However, in Dixon v. Commissioner, T.C. Memo. 2006-90 (Dixon VI), we observe that "the parties have agreed--and properly so--that the sanction [imposed in Dixon VI] applies to benefit not only the test case petitioners, but also to nontest case petitioners in all remaining docketed cases in the Kersting project, whether or not they signed piggyback agreements."  (Emphasis added.)  We similarly draw no distinction between piggybackers and non-piggybackers for purposes of our real party in interest analysis.

imposed by section 7430(c)(4)(A)(ii).[27]  We address that issue in Part III.F., infra.

C.    Substantial Justification Defense

1.    Identifying "the Position of the United States in the Proceeding"

Under section 7430(c)(4)(B)(i), it is "the position of the United States in the proceeding" that is evaluated under the substantial justification standard.  Typically, the position of the United States in a judicial proceeding for purposes of section 7430 is set forth in the Commissioner's answer to the petition.  E.g., Maggie Mgmt. Co. v. Commissioner, 108 T.C. 430, 442 (1997).  These proceedings, of course, are anything but typical.  Although these cases originated with petitions and answers in a tax deficiency setting, the appellate fees at issue are not directly related to those initial pleadings or the ensuing litigation on the merits.  Rather, the proceedings to

---

[27] In Cobell v. Norton, 407 F. Supp. 2d 140, 148 (D.D.C. 2005), the court concluded that the net worth affidavits of the named plaintiffs in the underlying class action "amply satisfy the [net worth] requirements of the [EAJA] statute for the entire class."  We note that the referenced class includes more than 350,000 claimants.  See id. at 145.  Olenhouse v. Commodity Credit Corp., 922 F. Supp. 489 (D. Kan. 1996), the EAJA case cited by the Norton court for support, is similarly inapposite. The court in Olenhouse, while recognizing that "[e]ach party seeking an award must meet the relevant net worth cap", id. at 492, concluded that the named plaintiffs, "i.e., those who prosecuted the claim", id. at 493, were the ones seeking the EAJA award; accordingly, they alone were required to meet the net worth requirement.  The court noted that the Government "has not shown that * * * unnamed members of the class were willing and able to bear the cost of the litigation."  Id.  That is not the case here.

which these fees relate involve the legal and factual issues raised by the misconduct of IRS attorneys McWade and Sims in the original trial of the test cases.  Accordingly, we look to the misconduct inquiry (as opposed to tax deficiency) phase of these proceedings to determine "the position of the United States in the proceeding".

While the parties are in general agreement that the relevant "position of the United States" derives from the misconduct inquiry phase of these proceedings, their respective submissions compel us to clarify exactly what it is we are testing against the substantial justification standard.  Not surprisingly, petitioners repeatedly draw our attention to the odious character of the attorney misconduct.  At the other end of the spectrum, respondent emphasizes the inherent reasonableness of defending a trial court victory on appeal.  In our view, the issue is not whether the conduct of Sims and McWade was substantially justified (it obviously was not), nor whether respondent's decision to defend his Dixon III victory against petitioners' appeals (as opposed to simply rolling over) was substantially justified (it obviously was).  Rather, our inquiry focuses on respondent's litigating position regarding the legal effect of the attorney misconduct (i.e., that such misconduct amounted to harmless error and therefore did not invalidate the decisions entered against the test case petitioners following the issuance of Dixon II).

## 2. Substantial Justification Analysis

We turn now to the issue of whether respondent's position, as identified above, was substantially justified.[28]  A position of the United States in a judicial proceeding is substantially justified if it has a reasonable basis in law and fact.  E.g., Maggie Mgmt. Co. v. Commissioner, supra at 443.  Common sense dictates that if the Government was able to prevail at trial (only to lose on appeal), its position ordinarily will have been reasonable.  See H. Rept. 97-404, at 15 (1981) (stating that in such situation "the appellate court would not normally award attorney's fees to the taxpayer since the trial court, by definition, had found the government's position to be reasonable"); S. Comm. on Fin., Technical Explanation of Committee Amendment, 127 Cong. Rec. 32070, 32078 (1981) (same); see also Ness v. Commissioner, 73 AFTR 2d 94-1195, at 94-1196 (9th Cir. 1994) (fact that the Commissioner prevailed in the Tax Court, while "not dispositive", is "significant").  On the other

_____

[28] In the case of proceedings commenced after July 30, 1996, the Government bears the burden of establishing that its position was substantially justified.  Sec. 7430(c)(4)(B)(i); see Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 701(d), 110 Stat. 1463 (1996).  In the case of proceedings commenced on or before that date, the taxpayer bears the burden of establishing that the Government's position was not substantially justified.  Sec. 7430(c)(4)(A)(i), prior to amendment by the Taxpayer Bill of Rights 2, supra.  The parties apparently assume that the current rule applies to these cases.  While our resolution of the substantial justification issue would be the same regardless of which rule applies, we are of the view that the relevant "proceedings" commenced prior to July 30, 1996.  Cf. supra note 19.

hand, it is "not always * * * true" that trial courts "[act] on a soundly reasoned basis in every tax case." Huckaby v. U.S. Dept. of Treasury, 804 F.2d 297, 299 (5th Cir. 1986); see also Henry v. Commissioner, 34 Fed. Appx. 342, 345 (9th Cir. 2002) (Court of Appeals had previously "found clear error in the Tax Court's findings" on negligence issue, which "leads to the conclusion that the Commissioner's position was not substantially justified").

As noted above, respondent took the position in Dixon III that the acknowledged attorney misconduct amounted to harmless error, and this Court agreed. While we would like to think that we "[acted] on a soundly reasoned basis" in adopting respondent's position, the Court of Appeals in Dixon V could not have been more clear in expressing and emphasizing its view that our holding in Dixon III did not have a reasonable basis in law. The Court of Appeals began by stating: "We review the Tax Court's refusal to grant a motion vacating a judgment on the basis of fraud on the court for abuse of discretion, mindful that only when this Court has a 'definite and firm conviction that the Tax Court committed a clear error of judgment in the conclusion it reached' is reversal appropriate." Dixon v. Commissioner, 316 F.3d 1041, 1046 (9th Cir. 2003) (citations omitted). The Court of Appeals quickly concluded: "Because the Tax Court applied the wrong legal standard, it abused its discretion." Id. Specifically, "[t]he Tax Court * * * applied the wrong law when

it imposed a requirement that taxpayers show prejudice as a result of the misconduct." Id. Taking our cue from Henry v. Commissioner, supra, we conclude that, given the foregoing language of the Court of Appeals in Dixon V, respondent's position in Dixon III was not substantially justified. Cf. Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004) ("Strong language against the government's position in an opinion [of a reversing appellate court] discussing the merits of a key issue is evidence in support of an award of EAJA fees.").

D.   Conclusion

We conclude that petitioners are entitled to relief under section 7430.

## III. Amount of Award

A.   Respondent's Position

Respondent argues that, even if petitioners are entitled to relief under section 7430, we should determine the amounts of their awards by giving effect to section 7430's hourly rate cap and by denying compensation for services respondent alleges are "redundant, excessive and unnecessary."[29]

B.   Applicability of Statutory Rate Cap

The rate cap to which fee awards under section 7430 are generally subject applies "unless the court determines that * * * a special factor, such as the limited availability of qualified

---

[29] Respondent does not quantify that argument in terms of noncompensable hours.

attorneys for such proceeding, the difficulty of the issues presented in the case, or the local availability of tax expertise, justifies a higher rate." Sec. 7430(c)(1)(B)(iii). Not surprisingly, petitioners urge us to lift the rate cap, while respondent argues that we have no legal basis for doing so.[30] We begin by examining the three examples of special factors in the statute and then discuss other factors that courts have taken into account in this context.

### 1. Limited Availability of Qualified Attorneys

The Supreme Court has narrowly interpreted the "limited availability of qualified attorneys" factor in the context of the EAJA. See Pierce v. Underwood, 487 U.S. 552, 571-572 (1988), interpreting 28 U.S.C. sec. 2412(d)(2)(A)(ii).[31] Specifically, the Court concluded that such language

> must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or

---

[30] The Hongsermeiers also argue that respondent's calculation of the applicable rate caps, see supra Part I.A., is erroneous. They maintain that a 27.6-point increase in the relevant CPI figures (i.e., from 151.075 to 178.675) requires a 27.6-percent increase in the statutory rate cap. That argument is based on a misapprehension of the statutory adjustment formula; it is the relative difference between CPI figures (i.e., 27.6/151.075 = 18.27 percent)--not the arithmetic difference-- that determines the adjustment. See sec. 1(f)(3) (cross-referenced in flush language of sec. 7430(c)(1)).

[31] "The reasoning employed by the courts under the attorney's fees provision of the Equal Access to Justice Act applies equally to review under section 7430." Huffman v. Commissioner, 978 F.2d at 1143.

> specialized skill needful for the litigation in question--as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation.  Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. * * *  [Id. at 572.]

Applying that reasoning, and leaving aside for the moment the issue of tax expertise,[32] we conclude that the general advocacy and case management skills of petitioners' counsel, while undoubtedly "needful for the litigation", do not justify a departure from the statutory rate cap under the "limited availability of qualified attorneys" exception, however extraordinary in degree and limited in supply those skills may be.  Cf. Hyatt v. Barnhart, 315 F.3d 239, 251 (4th Cir. 2002) ("plaintiffs do not contend that expertise in class action enforcement and procedure is a 'special factor' warranting an increase in the statutory [EAJA] maximum rate"; such expertise "should certainly not be beyond that possessed or easily acquired by reasonably competent attorneys"); Animal Lovers Volunteer Association, Inc. v. Carlucci, 867 F.2d 1224, 1226-1227 (9th Cir. 1989) (rejecting claim that "considerable expertise in appellate

---

[32] See infra Part III.B.2., discussing the "local availability of tax expertise" factor.  We note that, prior to the addition of that factor to sec. 7430 in 1998, see supra note 15, courts applying sec. 7430 generally held that, inasmuch as the provision applies exclusively to tax cases, counsel's tax expertise did not support the finding of a special factor.  See, e.g., Huffman v. Commissioner, supra at 1150; Cassuto v. Commissioner, 936 F.2d 736, 743 (2d Cir. 1991), affg. in part and revg. in part on other grounds 93 T.C. 256 (1989); McWilliams v. Commissioner, T.C. Memo. 1995-111.

matters that would be necessary to successfully prosecute an appeal against the enormous resources of the federal government" is a special factor under the EAJA); Scarborough v. Nicholson, 19 Vet. App. 253, 264 (2005) (rejecting specialization in Supreme Court litigation as a special factor under the EAJA).

### 2.   Local Availability of Tax Expertise

Petitioners' counsel do not fare any better with regard to this factor for the simple reason that tax expertise had little, if anything, to do with the misconduct inquiry phase of this litigation.  Cf. Hyatt v. Barnhart, supra at 252 (even if counsel's expertise in Social Security law could warrant a departure from the EAJA hourly rate cap, "there has been no satisfactory showing that such expertise was necessary to handle the dispute [interpretation of settlement agreement] that actually gave rise to the award of attorneys' fees and costs currently at issue").  Thus, while we do not question counsel's tax expertise, such expertise does not support the finding of a special factor under these circumstances.

### 3.   Difficulty of the Issues

Petitioners assert that the misconduct inquiry phase of these proceedings presented difficult issues relating to procedural due process, structural defect, "Footnote Nine" error,[33] and standards of proof and review applicable to the doctrine of harmless error.  Petitioners point to DuFresne v.

---

[33] See Brecht v. Abrahamson, 507 U.S. 619, 638 n.9 (1993).

Commissioner, 26 F.3d at 107, in which the Court of Appeals framed the issue as one of structural defect versus harmless error, as giving rise to the need to address the specified difficult issues.[34] The Court of Appeals, however, made no reference to any of those issues in its Dixon V opinion. Rather, the Court of Appeals focused solely on the issue of fraud on the court--specifically, whether fraud on the court requires a showing of prejudice (i.e., whether it is properly the subject of harmless error analysis). The court's 1-paragraph (with accompanying footnote) disposition of that issue, see Dixon v. Commissioner, 316 F.3d at 1047 & n.9, belies petitioners' assertion that the relevant issues in the case were sufficiently difficult to justify a departure from the statutory rate cap. Cf. Golembiewski v. Barnhart, 382 F.3d at 724 (rejecting the District Court's contention that the complexity of the case warranted a finding of substantial justification under the EAJA; "our opinion does not reveal a complex case").

4. Other Possible Special Factors

a. In General

In Pierce v. Underwood, 487 U.S. 552 (1988), the Supreme Court recognized that the language of the EAJA admits of other possible special factors in addition to the statutory example of

---

[34] In fairness to petitioners, they took their cue from us in that regard; we framed our analysis in Dixon III in terms of structural defect versus harmless error in response to DuFresne.

limited availability of qualified attorneys.  After narrowly interpreting that factor, the Court continued:

> For the same reason of the need to preserve the intended effectiveness of the [then applicable] $75 cap, we think the other "special factors" envisioned by the exception must be such as are not of broad and general application. * * * The "novelty and difficulty of issues," "the undesirability of the case," the "work and ability of counsel," and "the results obtained," are factors applicable to a broad spectrum of litigation; they are little more than routine reasons why market rates are what they are.  The factor of "customary fees and awards in other cases," is even worse; it is not even a routine reason for market rates, but rather a description of market rates. * * * [Id. at 573; citations to Pet. for Cert. omitted.]

Although Congress subsequently amended section 7430 to include one of the factors specifically rejected by the Court in Pierce (i.e., the difficulty of the issues), see supra note 15, there is no indication in the relevant legislative history that the amending Congress intended any broader retreat from the general principles expressed in the foregoing excerpt in the context of section 7430.  Thus, factors that are of "broad and general application" (including the undesirability of the case, work and ability of counsel, and results obtained) presumably remain insufficient justification for lifting the caps.

### b.    The Government's Misconduct

It is certainly tempting to point to the attorney misconduct in this litigation as a special factor that justifies a departure from the hourly rate cap of section 7430.  Support for that position may be found in Jean v. Nelson, 863 F.2d 759 (11th Cir.

1988), affd. on other grounds sub nom. <u>Commissioner, INS v. Jean</u>, 496 U.S. 154 (1990), in which a divided panel of the Court of Appeals for the Eleventh Circuit concluded that the Government's misconduct can be a special factor under the EAJA.[35] The majority rejected the notion that the threshold "reasonableness" inquiry under the EAJA precludes any further consideration of the Government's behavior:

> As the dissent points out, the EAJA already requires that the government's position have no 'reasonable basis in law and fact' as a condition precedent to the recovery of fees. The EAJA does not, however, protect a litigant against potential government harassment. It is easy to imagine a situation where a position that is not 'substantially justified' is exacerbated by improper purposes in defending the lawsuit. * * * Thus, if the government in this case advanced litigation for any improper purpose such as harassment, unnecessary delay or increase in the plaintiffs' expense, then consistent with <u>Pierce</u>, its action warrants the imposition of a special factor. [<u>Id.</u> at 776 n.13.]

See also <u>Pollgreen v. Morris</u>, 911 F.2d 527, 537-538 (11th Cir. 1990). However, the Court of Appeals for the Fifth Circuit explicitly rejected the <u>Jean</u> analysis in <u>Estate of Cervin v. Commissioner</u>, 200 F.3d 351, 355-358 (5th Cir. 2000), affg. T.C. Memo. 1998-176, reasoning that the finding of a special factor under section 7430 based on the Government's misconduct would amount to an impermissible award of punitive damages. Accord <u>Cassuto v. Commissioner</u>, 936 F.2d 736, 743-744 (2d Cir. 1991),

---

[35] The Supreme Court's affirmance of <u>Jean</u> is limited to the Court of Appeals' holding that fees incurred in obtaining an EAJA fee award are recoverable regardless of whether the Government was substantially justified in opposing the initial fee request.

affg. in part and revg. in part on other grounds 93 T.C. 256 (1989); Fields v. Commissioner, T.C. Memo. 2002-320; see also In re Sealed Case 00-5116, 254 F.3d 233, 237 (D.C. Cir. 2001) (EAJA case).

We agree with the majority view and conclude that disregarding the section 7430 rate cap on the basis of the attorney misconduct in this litigation would improperly add a punitive aspect to the fee award. Stated differently, such an approach would blur the distinction between fee-shifting provisions and punitive measures that the Supreme Court has drawn in cases such as Cooter & Gell v. Hartmarx Corp., 496 U.S. at 409, and Chambers v. NASCO, Inc., 501 U.S. at 51-55. See supra Part I.B. As the dissent in Jean v. Nelson, 863 F.2d at 782 (Kravitch, J., dissenting), observed in reasoning that Government misconduct should not be treated as a special factor under the EAJA: "Rule 11 sanctions are always available to compensate 'a litigant whose opponent acts in bad faith in instituting or conducting litigation.'" Here, the acknowledged misdeeds of McWade and Sims have been the subject of sanctions under section 6673(a)(2)(B) with respect to proceedings at the trial level. See supra Part I.C. Such misconduct is relevant to our present task only in relation to the threshold issue under section 7430 of whether respondent's position regarding the legal ramifications of the misconduct was substantially justified. See supra Part II.C.

        c.    The Delay Factor

In <u>Library of Congress v. Shaw</u>, 478 U.S. 310 (1986), the Supreme Court held that a 30-percent increase in the lodestar amount of a Title VII fee award to account for the delay factor violated the "no-interest" rule, which prohibits the recovery of interest in a suit against the Government absent an express waiver of sovereign immunity with regard to interest.  Two years later, the Court of Appeals for the D.C. Circuit concluded that the "special factor" provision of the EAJA provides the express waiver of sovereign immunity required by <u>Shaw</u>.  <u>Wilkett v. ICC</u>, 844 F.2d 867, 876 (D.C. Cir. 1988).  The court therefore concluded that <u>Shaw</u> is not inconsistent with the law of that circuit holding that delay may be regarded as a special factor under the EAJA.  <u>Id.</u>; see also <u>Masonry Masters, Inc. v. Nelson</u>, 105 F.3d 708, 713-714 (D.C. Cir. 1997); <u>Okla. Aerotronics, Inc. v. United States</u>, 943 F.2d 1344, 1350 (D.C. Cir. 1991).

The Courts of Appeals for the Fifth and Eleventh Circuits have sided with the D.C. Circuit on the delay issue in the context of the EAJA, while the Courts of Appeals for the Seventh and Federal Circuits have gone the other way.  Compare <u>Perales v. Casillas</u>, 950 F.2d 1066, 1077 (5th Cir. 1992) (agreeing with the D.C. Circuit that "[e]ven after the Supreme Court's sweeping prohibition in <u>Shaw</u> of interest awards against the United States", "some forms of delay may justify enhancing the statutory

base rate under the EAJA"),[36] and <u>Pollgreen v. Morris</u>, <u>supra</u> at 537-538 (citing <u>Wilkett</u> but not <u>Shaw</u>; delay can be a special factor under the EAJA if "the length of the delay was excessive"), with <u>Marcus v. Shalala</u>, 17 F.3d 1033, 1039 (7th Cir. 1994) (<u>Wilkett</u>, <u>Okla. Aerotronics</u>, and <u>Perales</u> "amount to an end run around the no-interest rule in <u>Shaw</u> because the statutory provision allowing for a higher fee where there is a special factor is not the kind of express, unambiguous statutory language sufficient to waive sovereign immunity"), and <u>Chiu v. United States</u>, 948 F.2d 711, 721 (Fed. Cir. 1991) (stating in dictum that the argument for delay as a special factor would not pass muster under <u>Shaw</u>).[37]

We agree with the Courts of Appeals for the Seventh and Federal Circuits that the <u>Wilkett</u> line of authority runs directly counter to <u>Library of Congress v. Shaw</u>, <u>supra</u>.  See also <u>Wilkett v. ICC</u>, <u>supra</u> at 795 (Starr, J., dissenting from denial of rehg.

---

[36] The Court of Appeals for the Fifth Circuit subsequently stated, without mentioning <u>Perales</u> or its special factor analysis, that <u>Shaw</u> precludes an award of interest on a sec. 7430 fee award.  See <u>Wilkerson v. United States</u>, 67 F.3d 112, 120 n.15 (5th Cir. 1995).

[37] The courts in <u>Marcus v. Shalala</u>, 17 F.3d at 1039, and <u>Chiu v. United States</u>, 948 F.2d at 721, also contended that <u>Wilkett</u> runs afoul of the Supreme Court's subsequent admonition in <u>Pierce v. Underwood</u>, 487 U.S. at 573, that special factors under the EAJA cannot be of "broad and general application".  The Court of Appeals for the D.C. Circuit attempted to reconcile its holding in <u>Wilkett</u> with <u>Pierce</u> in <u>Okla. Aerotronics, Inc. v. United States</u>, 943 F.2d 1344, 1350 (D.C. Cir. 1991) (clarifying that "what makes the factor 'special' is not simple delay, but unusual delay").

en banc) ("the panel's decision is incompatible with the teachings of" Shaw); Okla. Aerotronics, Inc. v. United States, supra at 1353 (Williams, J., concurring and dissenting) (finding Wilkett's rationale "far from clear"); Masonry Masters, Inc. v. Nelson, supra at 714 (Henderson, J., concurring) (asserting that, because the EAJA lacks the express waiver contemplated in Shaw, fees awarded thereunder "can never be enhanced for delay as a matter of law"). In Shaw, the Supreme Court rejected the argument that language in Title VII making the Government liable for costs (including a reasonable attorney's fee) "the same as a private person" operated as an express waiver of sovereign immunity with respect to interest, even though interest on attorney's fees may be recovered in a Title VII suit against a private employer. In our view, the case for waiver was stronger under the version of Title VII at issue in Shaw[38] than it is under the EAJA or, by extension, section 7430. See Wilkerson v. United States, 67 F.3d 112, 120 n.15 (5th Cir. 1995) ("Nothing in § 7430 indicates that Congress intended to waive its immunity from interest awards"); Miller v. Alamo, 992 F.2d 766, 767 (8th Cir. 1993) (same); Austin v. Commissioner, T.C. Memo. 1997-157 (same); see also Intl. Woodworkers of Am., AFL-CIO, Local 3-98 v. Donovan, 792 F.2d 762, 766-767 (9th Cir. 1985) (pre-Shaw; no

---

[38] Title VII has since been amended to expressly allow the recovery of interest against the Government in Title VII actions. See 42 U.S.C. sec. 2000e-16(d) (2000); Landgraf v. USI Film Prods., 511 U.S. 244, 251 (1994).

interest on EAJA fee award since no statutory provision expressly authorizes such interest).

    d.    Test Case Status

One aspect of this litigation that is certainly "not of broad and general application" (and therefore potentially supports the finding of a special factor) is its test case status.  Undoubtedly, counsel's efforts have beneficially affected hundreds of nontest case petitioners.  At least one court, however, has explicitly rejected the notion that such widespread benefit may be treated as a special factor under the EAJA.  See Pollgreen v. Morris, 911 F.2d 527 (11th Cir. 1990).  Pollgreen involved an EAJA fee award to plaintiffs who had successfully challenged fines and property seizures stemming from their participation in the "Freedom Flotilla" of Cuban refugees in 1980.  The District Court had doubled the statutory rate, in part because the litigation benefited "not only * * * the Plaintiffs herein but a class of people, including over 1,000 vessel owners."  Id. at 537; see also Lyden v. Howerton, 731 F. Supp. 1545, 1556 (S.D. Fla. 1990) (same language in another "Freedom Flotilla" case).  The Court of Appeals concluded that the District Court's "consideration of the litigation's benefit to a broad class of people is foreclosed by Pierce's prohibition on considering 'the results obtained'".  Pollgreen v. Morris,

supra at 537.[39]  In that regard, we deem it noteworthy that <u>Pierce</u> itself involved a class action in which plaintiffs' counsel secured a $60 million settlement against the Department of Housing and Urban Development that was paid to more than 150,000 low-income tenants of federally subsidized housing projects.  See <u>Underwood v. Pierce</u>, 547 F. Supp. 256, 258 (C.D. Cal. 1982).

### 5.  Conclusion

For the reasons discussed above, we conclude that we are constrained to apply the statutory rate caps in determining the respective amounts of petitioners' fee awards under section 7430.

### C.  Compensable Hours

#### 1.  Respondent's Objections

##### a.  Duplicative Fees Due to Change of Counsel

Respondent argues that any fee award should exclude "duplicative attorneys' fees associated with two sets of appellate counsel having to read the same record and learn the same case."  While the inefficiencies associated with a change in counsel may, in some instances, warrant a reduced fee award, see, e.g., <u>Spell v. McDaniel</u>, 852 F.2d 762, 768 (4th Cir. 1988), we conclude that such a reduction would be inappropriate here.  As noted above, more than 300 nontest case petitioners have financed the test case litigation through contributions to the Defense

---

[39] The court also cited <u>Jean v. Nelson</u>, 863 F.2d at 775, a class action involving Haitian refugee claims, in which it had rejected "vindication of public rights" as a special factor under the EAJA.

Fund.  It is hardly surprising that this group, faced with the largely unfavorable outcome of Dixon III, would fracture over the issue of legal representation going forward.  Indeed, given the number of contributors to the Defense Fund, three sets of appellate counsel (i.e., Izen, Minns, and Porter & Hedges) does not seem unreasonable.[40]  Therefore, we shall not reduce the number of compensable hours merely to account for the fact that Minns and Porter & Hedges had to "read the same record and learn the same case" with which Izen was already familiar.

>        b.    Overstaffing

Respondent also asserts that "it is apparent that these cases have been overstaffed by both Mr. Minns and Porter and Hedges and that the number of hours charged by those firms for the appeal is excessive and outside the realm of reason."  In evaluating the reasonableness of the hours claimed, we are aided by the fact that, taking into account Izen's appellate fee request, we have before us three separate fee applications relating to the same appellate proceedings.[41]  Each of those applications contains a breakdown of hours devoted to various tasks as delineated in the Ninth Circuit's Form 9.  Regarding

---

[40] We note that three sets of counsel participated in the evidentiary hearing underlying our opinion in Dixon III as well: Izen, Jones, and Sticht.

[41] Although Jones has also filed a motion in this Court for appellate fees and expenses, see supra note 12, he did not directly participate in the appeals of the test cases as did Izen.

what we deem to be the four "core" categories (obtaining and reviewing records, legal research, preparing briefs, and preparing for and attending oral argument), Izen claims 676.65 hours, Minns claims 779.18 hours (including Lawfinders' time), and Porter & Hedges claims 1,013.9 hours. While it may be somewhat presumptuous for this Court to judge the relative merits of the appellate briefs,[42] we see no obvious justification for the significantly greater number of hours claimed by Porter & Hedges in these categories. Assuming for these purposes that the subject hours claimed by Izen and Minns represent the low end and the midpoint, respectively, of the range of reasonableness, we reduce the Porter & Hedges figure by 130 hours so that the

---

[42] We do observe that it was Izen who hewed to the line that the misconduct of respondent's attorneys was a fraud on the Court, and that the primary relief to which all eligible petitioners should be entitled is the benefit of the Thompson settlement. Binder and Minns argued primarily for the complete vacatur of this Court's decisions, which would result in a complete win--no deficiencies--for the petitioners (although Binder did suggest the Thompson settlement as an alternative). In the light of hindsight, Izen's approach has been vindicated; the Court of Appeals in Dixon V adopted both his diagnosis and his prescription without reservation.

Having said that, we do not mean to imply that all of Izen's appellate time was well spent. He was the only attorney who continued to argue that the Kersting tax shelters created valid tax deductions, a position not only contrary to the holdings of this Court in Dixon II and Dixon III, but also contrary to that of the Court of Appeals for the Ninth Circuit in the related promoter penalty case. See Kersting v. United States, 206 F.3d 817 (9th Cir. 2000). We also have the impression that considerable time was wasted at the appellate level in dealing with Izen's unsuccessful and unnecessary attempts to include hundreds of nontest cases in the Adairs' interlocutory appeal.

resulting figure (883.9 hours) for these categories is in line with the high end of the range of reasonableness.

c.   Porter & Hedges Client Conferences

Respondent alleges that the PH petitioners have failed to demonstrate the reasonableness of "charges for numerous conferences with various unidentified individuals, apparently members of the Steering Committee."  Our concern lies with the lack of subject matter descriptions for many of those conferences and other client communications such as e-mail correspondence. As discussed above, the committee hired Porter & Hedges not only to replace Minns but also to recover amounts previously paid to him.  We do not intend to hold the Government responsible for fees attributable to the latter task.  In that regard, the parties' submissions indicate that Binder assumed primary responsibility for the Porter & Hedges briefs, while Irvine dealt with the Minns situation and client relations, in addition to overseeing work on the briefs.  Most of the generic references to client contacts appear in Irvine's time entries, and common experience suggests that such contacts were more likely related to the Minns dispute or client relations than, say, appellate strategy.  Nevertheless, in the absence of subject matter descriptions, we assume that the time Irvine spent consulting with Defense Fund representatives was divided equally between matters relating to the Minns dispute and client relations on the one hand, and matters relating to the appeal, on the other.

### 2. Additional Adjustments to Time Claimed for the Appeals

#### a. Missing Minns Time Entries

Although Minns claims 577.42 hours of attorney and legal assistant time for his firm (i.e., not including the Lawfinders time) in the Hongsermeiers' initial appellate fee request, the accompanying time entries for Minns and his in-house staff cover only 462.56 hours. Inasmuch as those time entries run only through January 22, 2002, they do not cover the final preparation of the brief (apparently mailed on January 25, 2002), the preparation of the reply brief, or the oral argument.[43] While we are not inclined to provide Minns the opportunity to "prove up" his firm's undocumented efforts at this late date, we likewise are not prepared to disregard those efforts altogether. Accordingly, we shall credit Minns with the 66-hour block of time he categorized as "preparing for and attending oral argument" in his submission to the Court of Appeals and disallow the remaining 48.86 undocumented hours.[44]

---

[43] We note that there is no corresponding break in the Bates numbering of the documents accompanying the parties' special stipulation of facts (filed in this Court) regarding the appellate fee requests.

[44] Only 11.5 of those 48.86 hours are attributable to Minns; the balance is attributable to his associate attorney and his legal assistant.

b. <u>Minns Hours Relating to Dispute With Committee</u>

As stated above, we will not hold the Government responsible for fees attributable to the dispute between the steering committee and Minns. Following the approach used above with regard to Irvine's time, we assume that, absent subject matter descriptions to the contrary, the time Minns and his staff spent during December 2001 and January 2002 communicating with clients was divided equally between damage control and matters relating to the appeal. Similarly, we assume that time spent communicating with Irvine during this contentious period was devoted to "self defense" and to coordination efforts in equal measure.

c. <u>Additional Porter & Hedges Time Relating to Minns Dispute</u>

We have previously dealt with Irvine's nondescriptive time entries relating to client communications. We add here that, consistent with our treatment of Minns, we assume, absent subject matter descriptions to the contrary, that time spent by Irvine communicating with Minns and his staff was divided equally between matters relating to the Minns dispute and matters relating to the appeal. We also disallow the relatively small amount of time Irvine devoted to "review of contracts", as that task is clearly identifiable with his firm's engagement by the steering committee to handle its dispute with Minns.

      d.    <u>Porter & Hedges Time Relating to Bill of Costs</u>

Porter & Hedges claims approximately 33 hours of attorney time (most of it Binder's) relating to a bill of costs in the amount of $5,663.40.[45]  See Fed. R. App. P. 39.  We see no justification for the devotion of that much time to a task normally considered ministerial.  In that regard, we note that Minns has not claimed <u>any</u> time relating to the bill of costs he filed on behalf of the Hongsermeiers.  We disallow all but 5 hours of attorney time relating to the PH petitioners' bill of costs.

      e.    <u>Porter & Hedges Time Relating to Remand</u>

A few of Binder's time entries describe time spent analyzing the illicit Thompson settlement shortly after the Court of Appeals' issuance of Dixon V.  As those entries relate to the ensuing remand proceedings in this Court, they are not properly the subject of an appellate fee request.  See <u>supra</u> text accompanying note 21.

      3.    <u>Adjustments to Porter & Hedges Time Relating to Fee Request</u>

      a.    <u>Initial Research Time</u>

According to the Porter & Hedges time entries, four attorneys spent 85.2 hours researching section 7430 and attorney's fees issues (and memorializing that research) before

---

[45] The Court of Appeals ultimately allowed $3,808.50 of such costs.

work on the actual fee request even began.  That seems excessive

to us, and we accordingly reduce those hours by 50 percent.

        b.    <u>Time Relating to Unsuccessful Claims</u>

All of the adjustments we have made thus far relate to

either (1) documentation or (2) what may be termed the efficiency

aspect of the reasonableness standard incorporated into section

7430.  In <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436 (1983), a case

involving CRAFAA (the general civil rights fee-shifting

statute),[46] the Supreme Court addressed another aspect of

reasonableness in this context:

> If * * * a plaintiff has achieved only partial or
> limited success, the product of hours reasonably
> expended on the litigation as a whole times a
> reasonable hourly rate may be an excessive amount.* * *
>
> * * * That the plaintiff is a "prevailing party"
> therefore may say little about whether the expenditure
> of counsel's time was reasonable in relation to the
> success achieved. * * *

Professor Sisk sometimes refers to this aspect of the

reasonableness standard as the limited success factor.  Sisk,

"The Essentials of the Equal Access to Justice Act:  Court Awards

of Attorney's Fees for Unreasonable Government Conduct (Part

Two)," 56 La. L. Rev. 1, 119 (1995).

The Supreme Court subsequently referred to the limited

success factor in the context of "fees for fees" (i.e., fees

---

[46] "The standards set forth in this opinion are generally
applicable in all cases in which Congress has authorized an award
of fees to a 'prevailing party.'"  <u>Hensley v. Eckerhart</u>, 461 U.S.
424, 433 n.7 (1983).

incurred in obtaining a fee award) in Commissioner, INS v. Jean, 496 U.S. 154 (1990). As discussed in Part I.B., supra, the Court in Jean held that fees for fees are recoverable under the EAJA without a separate showing that the Government's opposition to the fee award was not substantially justified. In response to the Government's argument that such a holding would have the effect of allowing "an automatic award of 'fees for fees'", id. at 162, the Court stated:

> Because Hensley v. Eckerhart, 461 U.S. 424, 437 (1983), requires the district court to consider the relationship between the amount of the fee awarded and the results obtained, fees [claimed] for fee litigation should be excluded [from the award] to the extent that the applicant ultimately fails to prevail in such litigation. For example, if the Government's challenge to a requested rate for paralegal time resulted in the court's recalculating and reducing the award for paralegal time from the requested amount, then the applicant should not receive fees for the time spent defending the higher rate. [Id. at 163 n.10.]

The Court of Appeals for the Ninth Circuit has expressly held that "the legal principles for recovering attorney's fees laid out in Hensley [citation omitted] apply to requests for fees-on-fees". Thompson v. Gomez, 45 F.3d 1365, 1367 (9th Cir. 1995); see also Atkins v. Apfel, 154 F.3d 986, 990 (9th Cir. 1998).

While it is often difficult to allocate attorney time between successful and unsuccessful issues and claims, "denial of a particular form or aspect of relief occasionally may be attributable to a discrete motion or proceeding, thus allowing the limited success factor to be measured by hours devoted to

that effort."  Sisk, 56 La. L. Rev. at 119; see also Hensley v. Eckerhart, supra at 436 (one way a court can give effect to the limited success factor is by "attempt[ing] to identify specific hours that should be eliminated").  That is the case with regard to our rejection of the PH petitioners' attempts (1) to avoid the section 7430 rate cap by asserting entitlement under the bad faith exception and section 6673, and (2) to obtain interest on their fee award (see infra Part IV).  Specifically, the PH petitioners' August 2005 amendment of their fee request (and the prerequisite motion for leave to amend), their motion for reconsideration of our September 1, 2005 order, and their November 2005 request for appellate fees under section 6673 pertain exclusively to those unsuccessful claims.  We therefore disallow the 123.7 hours Porter & Hedges devoted to those filings.[47]  Cf. Anthony v. Sullivan, 982 F.2d 586 (D.C. Cir. 1993) (plaintiff initially sought recovery of fees under both the Title VII fee provision, which contains no rate cap, and the EAJA; after Court of Appeals overturned the Title VII award, plaintiff established entitlement to EAJA award on remand; held, Hensley dictates that plaintiff's EAJA award not include any fees incurred in the unsuccessful defense of the Title VII award on appeal).

---

[47] We do not intend to suggest thereby that the positions taken in those filings are in any way frivolous.  See Hensley v. Eckerhart, supra at 436 (partial or limited success must be taken into account even though the unsuccessful claims are nonfrivolous and raised in good faith).

D.   Computation of Potentially Compensable Fees

We now determine the amount of claimed fees that, to the extent paid or incurred by real parties in interest who satisfy section 7430's net worth requirement (hereafter, eligible persons), see infra Part III.F., are compensable under section 7430.  Where the fee requests reflect the use of "block billing" (i.e., the assignment of multiple discrete tasks to a single block of time), we use our best judgment to allocate the aggregate amount of time among the various tasks.

1.   The Hongsermeiers--Work on the Appeal[48]

a.   2001

Taking into account the $140 rate cap in effect for 2001, the Hongsermeiers claim 377.17 hours at $140 per hour, 31 hours at $100 per hour, and 17.69 hours at $50 per hour.  Regarding the 50-percent reduction for time deemed attributable to both the dispute with the steering committee and the appeal, we have assigned 16.4 hours in December to client communications (Minns: 8.5 hours; associate attorney:  4.5 hours; legal assistant:  3.4 hours).  We therefore (1) reduce the $140 (Minns) time by 4.25 hours (50% of 8.5 = 4.25), leaving 372.92 hours; (2) reduce the $100 (associate) time by 2.25 hours (50% of 4.5 = 2.25), leaving

_____

[48] Because the Defense Fund retained Minns to pursue the appeal and a separate group subsequently retained him to pursue appellate fees, we compute the potentially compensable fees with respect to those two engagements separately.  The Hongsermeiers claim $220,201 for work on the appeal and $56,233.75 for work on the fee request.

28.75 hours; and (3) reduce the $50 (legal assistant) time by 1.7 hours (50% of 3.4 = 1.7), leaving 15.99 hours. The resulting amount is $55,883.30, determined as follows: [(372.92 X $140) + (28.75 X $100) + (15.99 X $50)] = ($52,208.80 + $2,875 + $799.50) = $55,883.30.

        b.    2002

    Taking into account the $150 rate cap in effect for 2002, the Hongsermeiers claim 446.95 hours at $150 per hour, 34.4 hours at $100 per hour, and 23.11 hours at $50 per hour. Of the 48.86 hours disallowed due to missing time entries, 11.5 hours relate to $150 time, 20.8 hours relate to $100 time, and 16.56 hours relate to $50 time. Regarding the 50-percent reduction for January 2002 time deemed attributable to both the rift with the steering committee and the appeal, we have assigned 6.9 hours to client communications (Minns: 5.1 hours; legal assistant: 1.8 hours) and 2.9 hours to Irvine communications (Minns: 1.9 hours; legal assistant: 1 hour). We therefore reduce the $150 (Minns) time by an additional 3.5 hours (5.1 + 1.9 = 7; 50% of 7 = 3.5) and reduce the $50 (legal assistant) time by an additional 1.4 hours (1.8 + 1 = 2.8; 50% of 2.8 = 1.4). That leaves 431.95 hours of $150 time (446.95 - 11.5 - 3.5 = 431.95), 13.6 hours of $100 time (34.4 - 20.8 = 13.6), and 5.15 hours of $50 time (23.11 - 16.56 - 1.4 = 5.15). The resulting amount is $66,410, determined as follows: [(431.95 X $150) + (13.6 X $100) + (5.15 X $50)] = ($64,792.50 + $1,360 + $257.50) = $66,410.

c.    Total

The total amount of potentially compensable fees with respect to the Hongsermeiers' fee request for work on the appeal is $122,293.30 ($55,883.30 for 2001 and $66,410 for 2002).

2.    The Hongsermeiers-Work on the Fee Request

a.    2003 to 2005

Taking into account the $150 rate cap in effect during the years 2003 through 2005, the Hongsermeiers claim 177.85 hours at $150 per hour, 92.75 hours at $125 per hour, 2.4 hours at $75 per hour, and 2.65 hours at $50 per hour.  The resulting amount is $38,583.75, determined as follows: [(177.85 X $150) + (92.75 X $125) + (2.4 X $75) + (2.65 X $50)] = ($26,677.50 + $11,593.75 + $180 + $132.50) = $38,583.75.

b.    2006

Taking into account the $160 rate cap in effect for 2006, the Hongsermeiers claim 0.5 hours at $160 per hour, 0.9 hours at $125 per hour, and 1.7 hours at $50 per hour.  The resulting amount is $277.50, determined as follows: [(0.5 X $160) + (0.9 X $125) + (1.7 X $50)] = ($80 + $112.50 + $85) = $277.50.

c.    Application of Limited Success Factor

While the Hongsermeiers did not join in the PH petitioners' unsuccessful fee request claims discussed in Part III.C.3.b., supra, that does not mean that Hensley's limited success factor has no application to their claim for fees on fees.  As Professor Sisk observes: "Because ordinarily it is difficult to precisely

link a certain segment of legal services to the denial of particular relief, the limited success factor typically is addressed at a separate stage through a percentage downward adjustment of the lodestar."  Sisk, 56 La. L. Rev. at 119; see also Hensley v. Eckerhart, 461 U.S. at 436-437 (in applying the limited success factor, a court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success").  Here, the lodestar for the Hongsermeiers' fees on fees is $38,861.25 ($38,583.75 for 2003 through 2005, and $277.50 for 2006).  In determining the degree of success they achieved with regard to their fee request, we compare the number of "merits hours" they claimed (i.e., hours relating to the appeal--930.32) with the number of merits hours we have allowed (868.36).[49]  See Thompson v. Gomez, 45 F.3d 1365 (9th Cir. 1995) (upholding District Court's award of 87.2 percent of requested fees on fees to reflect the parties' 87.2-percent settlement with regard to requested "merits fees"); Harris v. McCarthy, 790 F.2d 753, 759 (9th Cir. 1986) (upholding District Court's award of 11.5 percent of requested fees on fees to reflect its award of 11.5 percent of requested merits fees).  The

---

[49] See supra Parts III.D.1.a. and III.D.1.b. (372.92 + 28.75 + 15.99 + 431.95 + 13.6 + 5.15 = 868.36).  We compare merits hours claimed to merits hours allowed rather than merits fees claimed to merits fees awarded because much of the difference between the merits fees claimed and the merits fees awarded in this case is attributable to sec. 7430's rate cap, the effect of which is already reflected in the fees on fees lodestar amount of $38,861.25.

resulting success ratio (868.36/930.32) is 93.33 percent, which we apply to the aforementioned lodestar to obtain the amount of potentially compensable fees on fees with respect to the Hongsermeiers' fee request: $36,269.20.[50]

### 3. The PH Petitioners

#### a. 2001

Taking into account the $140 rate cap in effect for 2001, the PH petitioners claim 112.15 hours at $140 per hour, 3.25 hours at $105 per hour, and 0.5 hours at $90 per hour. We begin by allocating to 2001 a portion of the 130-hour "overstaffing" reduction discussed above. Based on the Porter & Hedges time entries, we estimate that 10 percent of the hours devoted to tasks described in the "core" categories of the Ninth Circuit's Form 9, see supra Part III.C.1.b., are attributable to services performed in 2001. Accordingly, we reduce the time claimed for 2001 by 13 hours (10% of 130 = 13). Since more than 96 percent of the time claimed for 2001 falls into the $140 category, we further allocate the entire 13-hour reduction to the $140 time. Next, we apply the 50-percent reduction to Irvine's 2001 time deemed attributable to both the Minns dispute and the appeal. In

---

[50] We note here that, even though petitioners did not receive all the relief they requested on appeal, see supra note 42, we see no need to reduce their "merits fees" awards by applying a success ratio. See Hensley v. Eckerhart, 461 U.S. at 435 & n.11 (where plaintiff obtains "excellent results", fee award will normally encompass all hours reasonably expended on the litigation; fact that such plaintiff did not receive all the relief requested is not necessarily significant).

that regard, we have assigned 10.5 hours to generic client communications and 1.5 hours to Minns communications. We therefore reduce the $140 time by an additional 6 hours (10.5 + 1.5 = 12; 50% of 12 = 6). Finally, we have assigned 0.75 hours to Irvine's review of contracts and further reduce the $140 time by that amount. The end result is a 19.75-hour reduction in the $140 time (13 + 6 + .75 = 19.75), leaving 92.4 hours of $140 time. The resulting amount is $13,322.25, determined as follows: [(92.4 X $140) + (3.25 X $105) + (0.5 X $90)] = ($12,936 + $341.25 + $45) = $13,322.25.

### b. 2002 to 2005

Taking into account the $150 statutory rate cap in effect during the years 2002 through 2005, the PH petitioners claim 1,683.85 hours at $150 per hour, 1 hour at $140 per hour, 0.7 hours at $130 per hour, 1.4 hours at $120 per hour, 2 hours at $105 per hour, 1 hour at $100 per hour, and 15.5 hours at $90 per hour. We adjust the $150 time to reflect the following reductions: (1) Remainder of the 130-hour overstaffing reduction--117 hours; (2) Irvine's time deemed attributable to the Minns dispute--7.8 hours;[51] (3) excessive time pertaining to the bill of costs--28 hours; (4) work attributable to the remand proceedings-

---

[51] We have assigned 15.6 hours of Irvine's 2002 time to generic client communications (10.9 hours) and Minns communications (4.7 hours). As we deem 50 percent of that time to be attributable to the Minns dispute, the resulting reduction is 7.8 hours (50% of 15.6 = 7.8).

-7.9 hours; (5) excessive preliminary research regarding section 7430 and attorney's fees issues--42.6 hours (85.2 X 50% = 42.6); and (6) time devoted to unsuccessful fee request claims--123.7 hours (119.2 hours of Binder's time and 4.5 hours of Irvine's time).  The end result is a 327-hour reduction in the $150 time (117 + 7.8 + 28 + 7.9 + 42.6 + 123.7 = 327), leaving 1,356.85 hours of $150 time.  The resulting amount is $205,631.50, determined as follows: [(1,356.85 X 150) + (1 X $140) + (0.7 X $130) + (1.4 X $120) + (2 X $105) + (1 X $100) + (15.5 X $90] = ($203,527.50 + $140 + $91 + $168 + $210 + $100 + $1,395) = $205,631.50.

### c.  2006

Taking into account the $160 rate cap in effect for 2006, the PH petitioners claim 67.9 hours at $160 per hour and 2.5 hours at $140 per hour.[52]  The resulting amount is $11,214, determined as follows: [(67.9 X $160) + (2.5 X $140)] = ($10,864 + $350) = $11,214.

### d.  Total

The total amount of potentially compensable fees with respect to the PH petitioners' fee request is $230,167.75

---

[52] In their final submission of fees and expenses, the PH petitioners seek to recover an additional $4,865 that Porter & Hedges estimates it will incur in pursuing the fee request "until this Court rules on this motion".  We are not aware of any authority supporting such a request, nor do we see the need for such additional fees and expenses under the circumstances.

($13,322.25 for 2001, $205,631.50 for 2002 through 2005, and $11,214 for 2006).

### E. Potentially Compensable Expenses

The PH petitioners claim additional costs in the amount of $20,307.18.  We reduce that amount by $2,425.66 as follows:

Delivery charges:  $105.11 (2 overnight deliveries to/from persons with no identifiable connection to the litigation--$26.86; extra charges for a Saturday package pickup--$75.25; discrepancy between claimed courier charge and computer backup--$3)

Computer research:  $444.39 (difference between amounts charged by provider and amounts reflected in billing records--$226.31; unidentified research sessions--$218.08)

Secretarial overtime:  $1,083.90

Double-counted charges:  $751.26 (3/10/03 to 4/30/03)

Miscellaneous:  $41 ("various tips"--$16; unidentified parking charge--$25)

The amount of potentially compensable expenses with respect to the PH petitioners' fee request is therefore $17,881.52.

As indicated above, the Hongsermeiers have not requested any expenses other than attorney's fees.

### F. Amounts Paid or Incurred by Eligible Persons

We now determine the extent to which eligible persons paid or incurred the potentially compensable fees and expenses with respect to the fee requests.

1.    Amounts Paid Through the Defense Fund

a.    Minns Agreement

The Defense Fund paid $185,000 in legal fees under the Minns agreement.  Of the $220,201 claimed by the Hongsermeiers for the corresponding legal services, see supra note 48, $122,293.30 is potentially compensable, see supra Part III.D.1., meaning that $97,907.70 is noncompensable ($220,201 - $122,293.30 = $97,907.70).  Given the fungibility of money, a case can be made for allocating the Fund's $185,000 expenditure between the potentially compensable fees and the noncompensable fees on a pro rata basis.  We are not aware of any authority requiring us to do so, and we think such an approach would run counter to the remedial purpose of section 7430.  Accordingly, we allocate the first $122,293.30 of the $185,000 expenditure to the potentially compensable fees and the remaining $62,706.70 ($185,000 - $122,293.30 = $62,706.70) to the noncompensable fees.

Next, we must identify the contributions to the Defense Fund from which the Fund's $185,000 expenditure derived.  Owing again to the fungibility of money, any methodology we use will be somewhat arbitrary.  Nevertheless, we believe it is reasonable to treat the $185,000 expenditure as having derived from the $268,200 contributed to the Fund by the Hongsermeiers and the group of 112 from January 2001 through November 2001.

The following table lists the persons described in the preceding paragraph (i.e., the Hongsermeiers and the group of

112) for whom we have received net worth affidavits, together
with the amount contributed by each such person to the Defense
Fund during the relevant period:

| Name | Amt. Contributed |
| --- | --- |
| Arbuckle | $2,400 |
| Asmus | $2,500 |
| Baccitich | $2,400 |
| Bakos | $2,400 |
| Beecher | $2,300 |
| Berger | $3,500 |
| Boettger | $2,300 |
| Bowersox | $2,600 |
| Branch | $2,400 |
| Bremner | $2,300 |
| Brown | $2,400 |
| Bruckner | $2,400 |
| Croft | $2,700 |
| Doyle | $2,300 |
| Ellis | $2,400 |
| Evans | $2,100 |
| Flatter | $2,600 |
| Fraser | $2,500 |
| Fruchnicht | $3,000 |
| Fusakio | $1,500 |
| Gaubert | $1,500 |
| Gavagan | $2,700 |
| Geisler | $2,400 |
| Graham | $2,500 |
| Hague | $1,800 |
| Hannan | $2,400 |
| Hartigan | $2,000 |
| Hatcher | $2,400 |
| Heintz | $2,500 |
| Hendrickson | $2,300 |
| Hillen | $2,300 |
| Hinrich | $2,000 |
| Hongsermeier | $2,600 |
| Howell | $2,300 |
| Humphries | $2,200 |
| Hunt | $2,900 |
| Jensen, John | $2,400 |
| Jensen, Steen | $2,300 |
| Johnson, Marvin | $1,500 |
| Jurewicz | $2,400 |
| Keadle | $2,500 |

| | |
|---|---|
| Kelley | $2,500 |
| Klasch | $2,500 |
| Krassner | $2,700 |
| Layman | $1,700 |
| Leslie | $1,700 |
| Maeda | $2,600 |
| McNamee | $2,300 |
| Meyners | $2,500 |
| Michaelson | $2,400 |
| Miller, Dale | $2,400 |
| Miller, R.B. | $2,800 |
| Millon | $3,000 |
| Muckle | $2,300 |
| Myers | $2,500 |
| Norrell | $2,500 |
| Oakes | $2,400 |
| Oyler | $2,700 |
| Pistoll | $2,500 |
| Porter | $2,300 |
| Proctor | $2,200 |
| Pylate | $1,500 |
| Richmond | $2,400 |
| Satterfield | $2,400 |
| Sheasley | $2,500 |
| St. John | $1,900 |
| Tice | $2,600 |
| Toman | $2,700 |
| Tynan | $2,700 |
| Villines | $2,400 |
| Watkins | $2,300 |
| Whittlesey | $2,500 |
| Wiater | $2,400 |
| Wilson | $2,400 |
| | $176,100 |

Thus, at least $176,100 of the $268,200 contributed to the Defense Fund by the Hongsermeiers and the group of 112 between January 2001 and November 2001 derives from eligible persons (we refer to such contributions as eligible contributions). Here, too, a case can be made for allocating the eligible contributions between the Defense Fund's $122,293.30 payment for potentially compensable fees and its $62,706.70 payment for noncompensable

fees on a pro rata basis.  Again, we are not aware of any authority requiring us to do so, and we think such an approach would run counter to the remedial purpose of section 7430. Accordingly, we allocate the eligible contributions first to the Defense Fund's $122,293.30 payment for potentially compensable fees.  It follows that eligible persons paid all of those potentially compensable fees.

### b.  Porter & Hedges Agreement

We take a similar approach with regard to the $60,000 the Defense Fund paid to Porter & Hedges.  Of the $514,821.90 claimed by the PH petitioners in their appellate fee request, $248,049.27 is potentially compensable.  See supra Parts III.D.3., III.E. First, we allocate the entire $60,000 expenditure to the potentially compensable fees and expenses.  Next, we identify the contributions to the Defense Fund from which the Fund's $60,000 expenditure derived.  We believe it is reasonable to treat the $60,000 expenditure as having derived from the $84,200 contributed to the Defense Fund by the Dixons and the group of 43 from December 2001 through April 2002.

The following table lists the persons described in the preceding paragraph (i.e., the Dixons and the group of 43) for whom we have received net worth affidavits, together with the amount contributed by each such person to the Defense Fund during the relevant period:

| Name | Amt. Contributed |
|------|------------------|
| Asmus | $2,000 |
| Bakos | $2,200 |
| Beecher | $2,100 |
| Brown | $2,000 |
| Bruckner | $2,000 |
| Croft | $2,100 |
| Dixon | $1,500 |
| Ellis | $2,000 |
| Gomes | $1,000 |
| Grippo | $2,500 |
| Hague | $2,000 |
| Hartigan | $1,500 |
| Hatcher | $2,000 |
| Heintz | $1,700 |
| Hillen | $2,000 |
| Hunt | $2,400 |
| Ingals | $2,100 |
| Johnson, Marvin | $1,500 |
| Johnson, M.P. | $1,500 |
| Jurewicz | $2,000 |
| Keadle | $1,800 |
| Klasch | $2,000 |
| Leslie | $2,000 |
| McNamee | $2,000 |
| Meyners | $2,100 |
| Miller, R.B. | $1,800 |
| Moore, L. | $1,700 |
| Norrell | $1,800 |
| Oyler | $1,500 |
| Pistoll | $2,000 |
| Porter | $2,000 |
| Pylate | $ 900 |
| Richmond | $2,000 |
| Satterfield | $2,000 |
| St. John | $1,500 |
| Tice | $2,000 |
| Tynan | $2,200 |
| Villines | $2,000 |
| Whittaker | $1,900 |
| Whittlesey | $2,000 |
| | $75,300 |

Thus, at least $75,300 of the $84,200 contributed to the Defense Fund by the Dixons and the group of 43 between December 2001 and April 2002 derives from eligible persons.  Again, we allocate the

eligible contributions first to the Fund's $60,000 payment for potentially compensable fees and expenses. It follows that eligible persons paid $60,000 of the potentially compensable amount of $248,049.27.

### 2. Amounts Paid Directly to Minns

The Hongsermeiers and each member of the group of 38 paid Minns a $3,500 retainer fee for continued representation of their interests in post-appellate matters, including services relating to the Hongsermeiers' appellate fee request. We have received net worth affidavits for all but five of those persons. Thus, at least $119,000 of the $136,500 initially paid by this group to Minns derives from eligible persons. We allocate that $119,000 first to the $56,233.75 claimed by the Hongsermeiers for services relating to the fee request. See supra note 48. It follows that eligible persons paid the entire portion of the claimed amount that is potentially compensable--$36,269.20. See supra Part III.D.2.

### 3. Amounts Incurred But Not Paid

While eligible persons have paid all the potentially compensable fees with respect to the Hongsermeiers' fee request (thus obviating the need to determine whether eligible persons are liable for any unpaid amounts), eligible persons have paid only $60,000 of the $248,049.27 that is potentially compensable with respect to the PH petitioners' fee request. Under the terms of the Defense Fund's agreement with Porter & Hedges, nontest

case petitioners Darrell Hatcher (now deceased), Robert Norrell, and Don Hunt are jointly and severally liable for the Fund's obligations under the agreement, which would include the remaining potentially compensable fees and expenses of $188,049.27 ($248,049.27 - $60,000 = $188,049.27). Since we have received net worth affidavits for Messrs. Norrell and Hunt, it follows that eligible persons are liable for, and therefore incurred, the remaining potentially compensable fees and expenses of $188,049.27.[53]

### 4. Summary

Eligible persons have paid or incurred all the potentially compensable amounts with respect to the appellate fee requests.

### G. Final Figures

We shall award (1) attorney's fees in the amount of $158,562.50 ($122,293.30 paid through the Defense Fund and $36,269.20 paid outside the Defense Fund) in respect of the Hongsermeiers' appellate fee request, and (2) attorney's fees and

---

[53] Respondent does not suggest, nor do we have any reason to believe, that the disproportionate liability of Messrs. Norrell and Hunt is not bona fide. Cf. Sisk, "The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part One)," 55 La. L. Rev. 217, 337-341 (1994) (discussing the potential for manipulation of the EAJA eligibility requirements when counsel represents both eligible and ineligible parties).

expenses in the amount of $248,049.27 in respect of the PH petitioners' appellate fee request.[54]

IV.    Interest

The PH petitioners seek interest on their fee award from January 17, 2003 (the date of the Court of Appeals' Dixon V opinion).  As discussed in Part III.B.4.c., supra, the "no-interest" rule prohibits the recovery of interest in a suit against the Government absent an express waiver of sovereign immunity from an award of interest.  Library of Congress v. Shaw, 478 U.S. at 311.  Section 7430 contains no such express waiver, see Wilkerson v. United States, 67 F.3d at 120 n.15; Miller v. Alamo, 992 F.2d at 767; Austin v. Commissioner, T.C. Memo. 1997-157, and petitioners do not point to any other provision that might fit the bill.  Cf. Miller v. Alamo, supra at 767 (rejecting the argument that 28 U.S.C. sec. 1961(c)(1) operates as an express waiver of sovereign immunity from interest on a section 7430 fee award).  Accordingly, we deny the PH petitioners' request for interest on their fee award.[55]

-----

[54] We shall address the manner in which the awards are to be administered in a separate order or orders implementing this opinion.  In that regard, we note that some nontest case petitioners who contributed to the Defense Fund during the relevant period have not been asked to submit net worth affidavits and therefore have not had the opportunity to establish their right to share in the awards.

[55] We recognize that in Dixon IV we granted postjudgment interest on petitioners' sec. 6673(a)(2) fee award.  We did so sua sponte on the basis of "this Court's inherent power to protect its own proceedings from abuse, oppression, and

(continued...)

To reflect the foregoing,

                                    Appropriate orders will be

issued.

_____

[55](...continued)
injustice", without the benefit of briefs on the subject.
Whatever one's views may be on the interrelationship between the
doctrines of inherent authority and sovereign immunity, compare
United States v. Horn, 29 F.3d 754, 764 (1st Cir. 1994), with
United States v. Woodley, 9 F.3d 774, 782 (9th Cir. 1993), that
issue is not presented here.

Appendix A--September 1, 2005 Order

*assigned Beghe*

UNITED STATES TAX COURT
Washington, D.C. 20217

```
JERRY DIXON AND PATRICIA A. DIXON,  )
ET. AL.,                            )
                                    )   Docket Nos.  9382-83
            Petitioners            )                15907-84
                                    )                40159-84
       v.                           )                30979-85
                                    )                29643-86
COMMISSIONER OF INTERNAL REVENUE,   )
                                    )
            Respondent.             )
```

O R D E R

On March 30, 1999, the Court issued its Supplemental Memorandum Findings of Fact and Opinion, Dixon v. Commissioner, T.C. Memo. 1999-101 (Dixon III), and entered decisions in the captioned cases. In Dixon III, we held that the misconduct of the Government attorneys in the trial that included the captioned cases did not constitute a structural defect in the trial but rather resulted in harmless error. We did, however, impose sanctions against respondent in the form of interest reductions.

On June 24, 1999, petitioners in the captioned cases, together with other petitioners then represented by Joe Alfred Izen, Jr. and petitioners represented by Robert Alan Jones, moved for attorneys' fees and expenses (the initial fee requests). The initial fee requests relied in part on sections 6673 and 7430.[1] The Court vacated the decisions in the captioned cases and ordered the movants to submit documentation pertaining to fees and expenses incurred commencing on June 10, 1992.[2]

On March 31, 2000, the Court issued its Supplemental Memorandum Opinion, Dixon v. Commissioner, T.C. Memo. 2000-116 (Dixon IV), and entered decisions in the captioned cases reflecting the Dixon III and Dixon IV opinions. In Dixon IV, we rejected the initial fee requests insofar as they relied on section 7430, on the ground that the movants had not substantially prevailed within the meaning of section

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] June 10, 1992 is the date on which the Court granted leave and filed respondent's motions to vacate the decisions in Cravens v. Commissioner, Docket Nos. 16900-83 and 15135-84, and Thompson v. Commissioner, Docket Nos. 19321-83, 31236-84, and 30965-85.

7430(c)(4)(A)(i). We did, however, award a portion of the claimed fees and expenses under section 6673(a)(2).[3]

Petitioners in the captioned cases appealed our decisions to the United States Court of Appeals for the Ninth Circuit. The Court of Appeals reversed and remanded, holding that the misconduct of the Government attorneys in the trial that included the captioned cases amounted to fraud on the court. See Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V). Petitioners in Docket Nos. 9382-83, 15907-84, 40159-84, and 30979-85 (the PH petitioners) then filed with the Court of Appeals a request for attorneys' fees and expenses relating to services provided by Porter & Hedges, L.L.P. in connection with the appeals. Petitioners in Docket No. 29643-86 (the Minns petitioners) filed a similar request with the Court of Appeals relating to services provided by Michael Minns, P.L.C. in connection with the appeals. As filed, both appellate fee requests relied exclusively on section 7430. The Court of Appeals remanded the appellate fee requests to this Court "for a determination of entitlement, and, if warranted, amount".

On August 18, 2005, the PH petitioners moved for leave to amend their appellate fee request (the PH appellate fee request). We granted the motion and filed the subject amendment (the amendment). By the amendment, the PH petitioners premise their entitlement to the requested fees and expenses on the "bad faith" exception to the so-called American rule,[4] while continuing to rely on section 7430 as an alternative ground.[5]

The Court has determined that, although the appellate fee requests were filed on behalf of petitioners in the captioned cases (hereafter, petitioners), the real parties in interest include all persons who stand to benefit from the successful prosecution of those requests (i.e., those individuals who have made payments to Porter & Hedges or Michael Minns, P.L.C.-- through contributions to the Atlas Legal Defense Fund or

---

[3] Our award would not have been any more generous had we proceeded under section 7430 or any other theory of recovery.

[4] The American rule generally prohibits a Federal court from awarding attorneys' fees in the absence of a statute or contract providing for a fee award. Chambers v. NASCO, Inc., 501 U.S. 32, 61 (1991) (Kennedy, J., dissenting).

[5] The PH petitioners also seek interest on the requested fees and expenses from January 17, 2003 (the date of the Court of Appeals' Dixon V opinion). We reserve judgment on that aspect of the amendment at this time.

otherwise--or are liable to Porter & Hedges or Michael Minns, P.L.C. for the unpaid portion of the requested fees and expenses). Accordingly, the Court cannot rule on the appellate fee requests insofar as they rely on section 7430 without knowing how many of the real parties in interest satisfy the net worth requirement imposed by section 7430(c)(4)(A)(ii). Because the PH petitioners no longer rely solely on section 7430, we take this opportunity to address their newly advanced claim that they are entitled to recover the requested fees and expenses under the bad faith exception to the American rule.

In Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990), the Supreme Court held that a district court may not include in a Rule 11 sanction the amount of fees incurred defending the award on appeal.[6] In so holding, the Court distinguished between fee awards imposed as sanctions and those granted under "fee-shifting" statutes designed to encourage private parties to vindicate their rights:[7] "As Rule 11 is not a fee-shifting statute, the policies for allowing district courts to require the losing party to pay appellate, as well as district court attorney's fees, are not applicable." Id. at 409. Rather,

> Rule 11 is more sensibly understood as permitting an award only of those expenses directly caused by the [baseless] filing, logically, those at the trial level. * * * If the district court imposes Rule 11 sanctions on the plaintiff, and the plaintiff appeals, the expenses incurred in defending the award on appeal are directly caused by the district court's sanction and the appeal of that sanction, not by the plaintiff's initial filing in district court.

Id. at 406-407.[8]

---

[6] The Court noted that the Court of Appeals for the Ninth Circuit had adopted that view in Orange Production Credit Assn. v. Frontline Ventures Ltd., 801 F.2d 1581 (9th Cir. 1986). 496 U.S. at 405-406.

[7] See Commissioner, INS v. Jean, 496 U.S. 154, 164-165 (1990) (describing the purpose of the Equal Access to Justice Act, the fee-shifting statute from which sec. 7430 derives).

[8] As then in effect, Rule 11 authorized a district court to order the payment of fees and expenses incurred "because of" the filing of a document signed in violation of the rule. The rule now refers to fees and expenses incurred "as a direct result of" the violation. Fed. R. Civ. P. 11(c)(2).

- 4 -

We believe the principles enunciated in Cooter & Gell v. Hartmarx Corp., supra, preclude us from awarding appellate fees and expenses under the bad faith exception to the American rule (the bad faith exception). As is the case with a Rule 11 fee award, "the imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation." Chambers v. NASCO, Inc., 501 U.S. 32, 53 (1991). Under the reasoning of Cooter & Gell, then, any fee award based on the bad faith exception is properly limited to fees and expenses directly caused by the sanctionable conduct. To paraphrase the Supreme Court, the PH petitioners' appellate fees and expenses were directly caused by this Court's rulings in Dixon III, not by the attorney misconduct that occasioned the proceedings underlying that opinion.[9]

The Court of Appeals for the Ninth Circuit has applied Cooter & Gell's "direct causation" approach outside the context of Rule 11 on at least two occasions. See Lockary v. Kayfetz, 974 F.2d 1166, 1178 (9th Cir. 1992) (fees awarded under district court's inherent authority to impose sanctions; "Cooter & Gell suggests that the trial court should limit sanctions to the opposing party's more 'direct' costs", which do not include the costs of preparing the motion);[10] Lyddon v. Geothermal Properties, Inc., 996 F.2d 212, 214 (9th Cir. 1992) (citing Lockary and its reliance on Cooter & Gell, court concludes that fee award under Fed. R. App. Proc. 38 for frivolous appeal should not include the costs associated with computing the amount of the

---

[9] We recognize that, in Dixon IV, we awarded fees and expenses under sec. 6673, a punitive (as opposed to fee-shifting) provision, without distinguishing between trial and appellate proceedings. Under the reasoning of Cooter & Gell, the appellate fees and expenses included in the initial fee requests were directly caused by this Court's initial refusal to conduct an evidentiary hearing regarding the effect of the attorney misconduct on the trial of the test cases, not the attorney misconduct itself. Because we did not explicitly address the propriety of awarding appellate fees and expenses under sec. 6673 in Dixon IV, we do not consider ourselves bound by the law of the case doctrine to award appellate fees and expenses under the bad faith exception.

[10] Although Lockary v. Kayfetz did not involve Rule 11 sanctions, we note that Rule 11 now explicitly authorizes the awarding of fees and expenses incurred in "presenting or opposing" the motion for sanctions. Fed. R. Civ. P. 11(c)(1)(A).

- 5 -

award on remand).[11]  See also <u>Manion v. American Airlines</u>, 395 F.3d 428, 433 (D.C. Cir. 2004) (fee award under 28 U.S.C. § 1927 does not properly include the cost of defending the award on appeal; "much of [<u>Cooter & Gell</u>'s] rationale applies with equal force in the § 1927 context").[12]

Based on the foregoing, we shall continue to evaluate the PH appellate fee request solely under section 7430.

Premises considered, it is

ORDERED that, to the extent applicable, the PH petitioners and the Minns petitioners shall submit to the Court by October 28, 2005 the affidavit of each real party in interest (as described above) that his or her net worth as of June 10, 1992 did not exceed $2,000,000.  It is further

ORDERED that, in addition to counsel for petitioners and respondent, a copy of this order shall be served upon:

> Joe Alfred Izen, Jr., Esq.
> 5222 Spruce Street
> Bellaire, TX 77401

---

[11] The PH petitioners cite <u>Brown v. Sullivan</u>, 916 F.2d 492, 497 (9th Cir. 1990) for the proposition that, under the bad faith exception, a court may award fees incurred over "the entire course of the litigation * * * if it finds the fees incurred during the various phases of the litigation are in some way traceable to the [government's] bad faith."  Interestingly, the <u>Brown</u> court cited <u>Commissioner, INS v. Jean</u>, <u>supra</u> note 7 (fee award under the Equal Access to Justice Act--a fee-shifting statute--encompasses all aspects of the litigation), but did not cite <u>Cooter & Gell</u>, issued one week after <u>Jean</u>.  We note that two of the three judges comprising the <u>Brown</u> panel also sat on the panel that subsequently decided <u>Lockary v. Kayfetz</u>, <u>supra</u>.

[12] 28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

- 6 -

Declan J. O'Donnell, Esq.
499 S. Larkspur Drive
Castle Rock, CO   80104

Robert Alan Jones, Esq.
1061 E. Flamingo Rd., Ste. 7
Las Vegas, NV   89119

Robert Patrick Sticht, Esq.
P.O. Box 49457
Los Angeles, CA   90049


Renato Beghe
Judge



Dated: Washington, D.C.
       September 1, 2005

Appendix B--September 8, 2005 Order

UNITED STATES TAX COURT
Washington, D.C.  20217

JERRY DIXON AND PATRICIA A. DIXON, )   Docket Nos.  9382-83
ET. AL.,                        )                    17646-83
                                      )                    15907-84
                                      )                    40159-84
           Petitioners         )                    22783-85
                                        )                    30979-85
           v.                  )                    29643-86
                                        )                    19464-92
COMMISSIONER OF INTERNAL REVENUE,  )                   621-94
                                        )                 9532-94
           Respondent.         )

 O R D E R

On March 30, 1999, the Court issued its Supplemental Memorandum Findings of Fact and Opinion, Dixon v. Commissioner, T.C. Memo. 1999-101 (Dixon III), and entered decisions in Docket Nos. 9382-83, 15907-84, 40159-84, 30979-85, 29643-86, and 22783-85 (the test cases).  In Dixon III, we held that the misconduct of the Government attorneys in the trial of the test cases did not constitute a structural defect in the trial but rather resulted in harmless error.  We did, however, impose sanctions against respondent in the form of interest reductions.

On June 24, 1999, petitioners in the captioned cases moved for attorneys' fees and expenses relating to services provided by Joe Alfred Izen, Jr. and Robert Alan Jones (the initial fee requests).  The initial fee requests relied in part on sections 6673 and 7430.[1]  The Court vacated the decisions in the test cases and ordered the movants to submit documentation pertaining to fees and expenses incurred commencing on June 10, 1992.[2]

On March 31, 2000, the Court issued its Supplemental Memorandum Opinion, Dixon v. Commissioner, T.C. Memo. 2000-116 (Dixon IV), and entered decisions in the test cases reflecting the Dixon III and Dixon IV opinions.  In Dixon IV, we rejected the initial fee requests insofar as they relied on section 7430, on the ground that the movants had not substantially prevailed

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] June 10, 1992 is the date on which the Court granted leave and filed respondent's motions to vacate the decisions in Cravens v. Commissioner, Docket Nos. 16900-83 and 15135-84, and Thompson v. Commissioner, Docket Nos. 19321-83, 31236-84, and 30965-85.

within the meaning of section 7430(c)(4)(A)(i). We did, however, award a portion of the claimed fees and expenses under section 6673(a)(2).[3]

Petitioners in the test cases appealed our decisions to the United States Court of Appeals for the Ninth Circuit (the appeals). The Court of Appeals reversed and remanded, holding that the misconduct of the Government attorneys in the trial of the test cases amounted to fraud on the court. See Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V).

On May 19, 2005, petitioners in Docket No. 22783-85 moved for attorneys' fees and expenses relating to services provided by Mr. Izen in connection with the appeals.[4] On July 15, 2005, petitioners in Docket Nos. 17646-83, 19464-92, 621-94, and 9532-94 moved for attorneys' fees and expenses relating to services provided by Mr. Jones in connection with the appeals. The Izen and Jones appellate fee requests rely exclusively on section 6673.

Section 6673 vs. Section 7430

In Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990), the Supreme Court held that a district court may not include in a Rule 11 sanction the amount of fees incurred defending the award on appeal.[5] The Court began by observing that "[o]n its face, Rule 11 does not apply to appellate proceedings." Id. at 406. Moreover, the reference in Rule 11 (as then in effect) to fees and expenses incurred "because of" the offending filing did not extend its reach:

In this case, respondents argue, they would have incurred none of their appellate expenses had petitioner's lawsuit not been filed. This line of reasoning would lead to the conclusion that expenses incurred "because of" a baseless filing extend

───────────────

[3] Our award would not have been any more generous had we proceeded under section 7430 or any other theory of recovery.

[4] Petitioners in Docket Nos. 9382-83, 15907-84, 40159-84, 30979-85, and 29643-86 terminated their representation by Mr. Izen shortly after the commencement of the appellate process and therefore did not join in the motion. See infra note 14.

[5] The Court noted that the Court of Appeals for the Ninth Circuit had adopted that view in Orange Production Credit Assn. v. Frontline Ventures Ltd., 801 F.2d 1581 (9th Cir. 1986). 496 U.S. at 405-406.

indefinitely. * * * Such an interpretation of the Rule
is overbroad.  Rule 11 is more sensibly understood as
permitting an award only of those expenses directly
caused by the filing, logically, those at the trial
level. * * * If the district court imposes Rule 11
sanctions on the plaintiff, and the plaintiff appeals,
the expenses incurred in defending the award on appeal
are directly caused by the district court's sanction
and the appeal of that sanction, not by the plaintiff's
initial filing in district court.

Id. at 406-407.[6]  The Court went on to distinguish between fee
awards imposed as sanctions and those granted under "fee-
shifting" statutes designed to encourage private parties to
vindicate their rights:[7] "As Rule 11 is not a fee-shifting
statute, the policies for allowing district courts to require the
losing party to pay appellate, as well as district court
attorney's fees, are not applicable."  Id. at 409.

We believe the reasoning of Cooter & Gell v. Hartmarx Corp.,
supra, precludes us from awarding appellate fees and expenses
under section 6673.  As is the case with Rule 11, section 6673(a)
(on which the present movants rely) does not, on its face, apply
to appellate proceedings.[8]  Under the reasoning of Cooter & Gell,
the reference in section 6673(a)(2) to fees and expenses incurred
"because of" the sanctionable conduct does not extend the reach
of the statute beyond Tax Court proceedings.  Rather, any fee
award under section 6673 (which, like Rule 11, is not a fee-
shifting statute)[9] is properly limited to fees and expenses

---

[6] Rule 11 has since been amended to refer to fees and
expenses incurred "as a direct result of" the violation.  Fed. R.
Civ. P. 11(c)(2).

[7] See Commissioner, INS v. Jean, 496 U.S. 154, 164-165
(1990) (describing the purpose of the Equal Access to Justice
Act, the fee-shifting statute from which sec. 7430 derives).

[8] Indeed, the heading of sec. 6673(a) is "Tax Court
Proceedings", while the heading of sec. 6673(b) is "Proceedings
in Other Courts".

[9] That is, the applicability of sec. 6673 "depends not on
which party wins the lawsuit, but on how the parties conduct
themselves during the litigation."  Chambers v. NASCO, Inc., 501
U.S. 32, 53 (1991) (discussing the "bad faith" exception to the
so-called American rule, the rule that generally prohibits
Federal courts from awarding attorneys' fees in the absence of a
statutory or contractual provision to the contrary).

directly caused by the sanctionable conduct.  To paraphrase the Supreme Court, the appellate fees and expenses at issue were directly caused by this Court's rulings in Dixon III, not by the attorney misconduct that occasioned the proceedings underlying that opinion.[10]

The Court of Appeals for the Ninth Circuit has applied Cooter & Gell's "direct causation" approach outside the context of Rule 11 on at least two occasions.  See Lockary v. Kayfetz, 974 F.2d 1166, 1178 (9th Cir. 1992) (fees awarded under district court's inherent authority to impose sanctions; "Cooter & Gell suggests that the trial court should limit sanctions to the opposing party's more 'direct' costs", which do not include the costs of preparing the motion);[11] Lyddon v. Geothermal Properties, Inc., 996 F.2d 212, 214 (9th Cir. 1992) (citing Lockary and its reliance on Cooter & Gell, court concludes that fee award under Fed. R. App. Proc. 38 for frivolous appeal should not include the costs associated with computing the amount of the award on remand).  See also Manion v. American Airlines, 395 F.3d 428, 433 (D.C. Cir. 2004) (fee award under 28 U.S.C. § 1927 does not properly include the cost of defending the award on appeal; "much of [Cooter & Gell's] rationale applies with equal force in the § 1927 context").[12]

_____

[10] We recognize that, in Dixon IV, we awarded fees and expenses under sec. 6673 without distinguishing between trial and appellate proceedings.  Under the reasoning of Cooter & Gell, the appellate fees and expenses included in the initial fee requests were directly caused by this Court's initial refusal to conduct an evidentiary hearing regarding the effect of the attorney misconduct on the trial of the test cases, not the attorney misconduct itself.  Because we did not explicitly address the propriety of awarding appellate fees and expenses under sec. 6673 in Dixon IV, we do not consider ourselves bound by the law of the case doctrine to evaluate the Izen and Jones appellate fee requests under sec. 6673.

[11] Although Lockary v. Kayfetz did not involve Rule 11 sanctions, we note that Rule 11 now explicitly authorizes the awarding of fees and expenses incurred in "presenting or opposing" the motion for sanctions.  Fed. R. Civ. P. 11(c)(1)(A).

[12] 28 U.S.C. § 1927, from which sec. 6673 derives, provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses,

By contrast, a fee award under a fee-shifting statute such as section 7430 generally encompasses all aspects of the litigation. See Commissioner, INS v. Jean, 496 U.S. 154, 161-162 (1990) (while "[a]ny given civil action can have numerous phases", "the [Equal Access to Justice Act]--like other fee-shifting statutes--favors treating a case as an inclusive whole"; accordingly, fees incurred in obtaining an EAJA fee award are recoverable regardless of the Government's reasonableness in contesting the fee award). As noted above, the initial fee requests relied in part on section 7430, a position we rejected in Dixon IV on the ground that the movants had not substantially prevailed. In light of the test case petitioners' subsequent appellate victory, and in order to give effect to Jean's mandate to "[treat] a case as an inclusive whole" in applying fee-shifting statutes, we shall treat the present movants as having revived their section 7430 claims by means of the Izen and Jones appellate fee requests.[13]

## Net Worth Requirement

For purposes of section 7430, a "prevailing party" must meet the net worth requirement of 28 U.S.C. § 2412(d)(2)(B) (as in effect on October 22, 1986). Sec. 7430(c)(4)(A)(ii). Rule 231(b)(4) requires the submission of the moving party's affidavit to that effect. Although the initial fee requests relied in part on section 7430, neither included any such net worth affidavits. Furthermore, the Court has determined that the real parties in interest with respect to the Izen and Jones appellate fee requests include not only the present movants but all persons who stand to benefit from the successful prosecution of those requests (i.e., those individuals who have made payments of the requested appellate fees and expenses to Mr. Izen--directly or through contributions to the Atlas Legal Defense Fund--or Mr. Jones or are otherwise liable for any portion of the requested appellate fees and expenses). The Court cannot rule on the Izen

---

and attorneys' fees reasonably incurred because of such conduct.

[13] Jean arguably dictates that, in evaluating the Izen and Jones appellate fee requests under sec. 7430, we determine prevailing party and substantial justification issues in terms of the underlying deficiency litigation. Because the test case proceedings relating to the underlying deficiencies and the subsequent proceedings relating to attorney misconduct involved fundamentally different facts and issues, we believe we are justified in treating the attorney misconduct phase of the litigation as a separate proceeding for these purposes.

- 6 -

and Jones appellate fee requests without knowing how many of those real parties in interest satisfy the net worth requirement.

Premises considered, it is

ORDERED that, to the extent applicable, the present movants (petitioners in Docket Nos. 22783-85, 17646-83, 19464-92, 621-94, and 9532-94) shall submit to the Court by October 28, 2005 the affidavit of each real party in interest (as described above) that his or her net worth as of June 10, 1992 did not exceed $2,000,000.[14] It is further

ORDERED that, on or before October 28, 2005, respondent shall file separate responses to the Izen and Jones appellate fee requests consistent with this Order (i.e., by treating the requests as supplementing the initial fee requests under section 7430). It is further

ORDERED that, in addition to counsel for petitioners in the captioned cases and counsel for respondent, a copy of this order shall be served upon:

Declan J. O'Donnell, Esq.
499 S. Larkspur Drive
Castle Rock, CO 80104

Robert Patrick Sticht, Esq.
P.O. Box 49457
Los Angeles, CA 90049

Renato Beghe
Judge

Dated: Washington, D.C.
September 8, 2005

_____

[14] By Order dated September 1, 2005, we ordered counsel for petitioners in Docket Nos. 9382-83, 15907-84, 40159-84, 30979-85, and 29643-86 to perform a similar exercise with respect to their appellate fee requests. All counsel are encouraged to coordinate their efforts in this regard so that individuals who are real parties in interest with respect to more than one appellate fee request are not faced with multiple requests for net worth affidavits. Counsel shall provide each other with copies of any such "overlapping" net worth affidavits for inclusion in their respective submissions to the Court, as applicable.

Appendix C--November 18, 2005 Order

UNITED STATES TAX COURT
Washington, D.C.  20217

JERRY DIXON AND PATRICIA A. DIXON, )
ET. AL.,                            )
                                    )      Docket Nos.  9382-83
            Petitioners            )                   15907-84
                                    )                   40159-84
        v.                          )                   30979-85
                                    )                   29643-86
COMMISSIONER OF INTERNAL REVENUE,   )
                                    )
            Respondent.            )

O R D E R

        This Order responds to the motion for reconsideration of our
Order dated September 1, 2005, filed by petitioners in Docket
Nos. 9382-83, 15907-84, 40159-84, and 30979-85.  For the reasons
discussed below, we shall deny the motion for reconsideration.

Background

        Petitioners appealed the decisions we entered in their cases
reflecting our opinions in Dixon v. Commissioner, T.C. Memo.
1999-101 (Dixon III), and Dixon v. Commissioner, T.C. Memo. 2000-
116 (Dixon IV).  The Court of Appeals for the Ninth Circuit
reversed and remanded.  See Dixon v. Commissioner, 316 F.3d 1041
(9th Cir. 2003) (Dixon V).  Petitioners in Docket Nos. 9382-83,
15907-84, 40159-84, and 30979-85 (the PH petitioners) then filed
with the Court of Appeals a request for attorneys' fees and
expenses relating to services provided by Porter & Hedges, L.L.P.
in connection with the appeals.  Petitioners in Docket No. 29643-
86 (the Minns petitioners) filed a similar request with the Court
of Appeals relating to services provided by Michael Minns, P.L.C.
in connection with the appeals.  As filed, both appellate fee
requests relied exclusively on section 7430.[1]  The Court of
Appeals remanded the appellate fee requests to this Court "for a
determination of entitlement, and, if warranted, amount".

        On August 18, 2005, the PH petitioners moved for leave to
amend their appellate fee request.  We granted the motion and
filed the subject amendment (the amendment).  By the amendment,
the PH petitioners premise their entitlement to the requested
fees and expenses on the "bad faith" exception to the so-called

---

        [1] Unless otherwise indicated, all section references are to
the Internal Revenue Code of 1986, as amended, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

SERVED NOV 1 8 2005

- 2 -

American rule[2] (the bad faith exception), while continuing to rely on section 7430 as an alternative ground.[3]

The September 1 Order

In an Order dated September 1, 2005, we rejected the PH petitioners' newfound reliance on the bad faith exception. We did so primarily on the basis of Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990). The issue in that case was whether a district court could include in a Fed. R. Civ. P. 11 sanction the fees incurred in defending the award on appeal. Reasoning that "Rule 11 is more sensibly understood as permitting an award only of those expenses directly caused by the [baseless] filing, logically, those at the trial level", id. at 406, the Court broadly held that "Rule 11 does not authorize a district court to award attorney's fees incurred on appeal". Id. at 409. The Court further reasoned: "As Rule 11 is not a fee-shifting statute, the policies for allowing district courts to require the losing party to pay appellate, as well as district court attorney's fees, are not applicable." Id. We then observed that the Supreme Court had drawn a similar distinction, albeit in a different context, between the bad faith exception and fee-shifting statutes: "the imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation." Chambers v. NASCO, Inc., 501 U.S. 32, 53 (1991). We therefore surmised that the reasoning of Cooter & Gell is applicable to fee sanctions under the bad faith exception as well as those under Fed. R. Civ. P. 11 (hereafter, Rule 11).

In support of our reliance on Cooter & Gell, we cited three cases in which courts had similarly applied the "direct causation" approach of that case to fee sanctions not involving Rule 11. See Manion v. American Airlines, 395 F.3d 428, 433 (D.C. Cir. 2004) (fee award under 28 U.S.C. sec. 1927 for unreasonable and vexatious multiplication of the proceedings); Lyddon v. Geothermal Properties, Inc., 996 F.2d 212, 214 (9th Cir. 1992) (fee award under Fed. R. App. P. 38 for frivolous appeal); Lockary v. Kayfetz, 974 F.2d 1166, 1178 (9th Cir. 1992) (fee award under district court's exercise of its inherent

---

[2] The American rule generally prohibits a Federal court from awarding attorneys' fees in the absence of a statute or contract providing for a fee award. Chambers v. NASCO, Inc., 501 U.S. 32, 61 (1991) (Kennedy, J., dissenting).

[3] By the amendment, the PH petitioners also seek interest on the requested fees and expenses from January 17, 2003 (the date of the Court of Appeals' Dixon V opinion).

authority to sanction bad faith conduct). We also questioned the soundness (and continuing viability) of Brown v. Sullivan, 916 F.2d 492, 497 (9th Cir. 1990), a case the PH petitioners had cited for the proposition that, under the bad faith exception, a court may award attorneys' fees "for the entire course of the litigation, including time spent preparing, defending, and appealing * * * awards of attorney fees, if it finds that the fees incurred during the various phases of litigation are in some way traceable to the [Government's] bad faith." Specifically, we wondered why the Brown court cited as analogous authority Commissioner, INS v. Jean, 496 U.S. 154 (1990), a case involving a fee-shifting statute, rather than attempting to distinguish Cooter & Gell, a case (like Brown) involving a fee sanction. We also noted that two of the three judges comprising the Brown panel also sat on the panel that subsequently decided Lockary v. Kayfetz, supra.

Having rejected the PH petitioners' reliance on the bad faith exception, we confirmed that we would continue to evaluate their appellate fee request solely under section 7430. To that end, we ordered the PH petitioners and the Minns petitioners to submit net worth affidavits for each real party in interest (as described in the Order) with respect to their appellate fee requests on or before October 28, 2005. See sec. 7430(c)(4)(A)(ii); 28 U.S.C. sec. 2412(d)(2)(B); Rule 231(b)(4).

The Motion for Reconsideration

On November 7, 2005, the PH petitioners filed a motion for reconsideration of our September 1 Order (the motion).[4] We have reviewed the motion and find counsel's arguments unpersuasive. We address those arguments here by topic.

--Extension of Cooter & Gell

Counsel repeatedly asserts that the reasoning of Cooter & Gell should not extend to fee awards under the bad faith exception but offers no principled explanation why that is so. For instance, counsel sometimes suggests that the bad faith exception, unlike Rule 11, is a fee-shifting provision within the meaning of Cooter & Gell: "As an 'exception' to the fee-shifting [American] rule (which rule provides that fee-shifting is not generally permitted), the bad faith exception is a fee-shifting rule itself." Mot. par. 6; see also Mot. pars. 7 (28 U.S.C. sec. 2412(b) makes the bad faith exception applicable to the United

---

[4] The PH petitioners also filed on that date a request for attorneys' fees on appeal under sec. 6673(a)(2). We shall address that filing in a separate Order.

- 4 -

States; thus, "the bad faith exception, as a fee-shifting rule, is authorized by federal statute") and 9 ("the bad faith exception is the specific fee-shifting provision under applicable law with respect to cases involving fraud on the court by the United States"). Those statements clearly reflect a misunderstanding of the sense in which the Court in Cooter & Gell used the term "fee-shifting statute". The petitioner in Business Guides, Inc., v. Chromatic Communications Enterprises, Inc., 498 U.S. 533 (1991), made a similar mistake:

> In arguing that the monetary sanctions in this case constitute impermissible fee shifting, Business Guides relies on the Court's statement in Alyeska Pipeline Service Co. v. Wilderness Society, [421 U.S. 240, 247 (1975)], that, in the absence of legislative guidance, courts do not have the power "to reallocate the burdens of litigation" by awarding costs to the losing party in a civil rights suit; they have only the power to sanction a party for bad faith. * * * Rule 11 sanctions do not constitute the kind of fee shifting at issue in Alyeska.[5] Rule 11 sanctions are not tied to the outcome of litigation * * * .

498 U.S. at 552-553 (emphasis added); see also Chambers v. NASCO, Inc., 501 U.S. at 52 (rejecting the argument that footnote 31 of Alyeska limits the authority of a Federal court sitting in diversity to assess attorney's fees as a sanction; "[t]he limitation on a court's inherent power described there applies

---

[5] In his dissenting opinion in Business Guides, Justice Kennedy further described "the kind of fee shifting at issue in Alyeska":

> In [Alyeska], while confirming the authority of the courts to award attorney's fees against a party conducting vexatious or bad-faith litigation, we reversed an award of attorney's fees made on the theory that the prevailing party had acted as a 'private attorney general.'" We reaffirmed the American Rule that litigants in most circumstances must bear their own costs, and noted that Congress had itself provided for fee awards under various statutes when it thought fee shifting necessary to encourage certain types of claims. We held that "it [was] not for us to invade the legislature's province by redistributing litigation costs in the manner" proposed in that case. [421 U.S. at 271.]

498 U.S. at 565 (Kennedy, J., dissenting).

only to fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees.").

Elsewhere, counsel merely asserts that "the distinction in Cooter & Gell between sanctions and fee-shifting statutes does not equate Rule 11 with the bad faith exception". Mot. par. 7. The implication is that, regardless of the meaning of the term "fee-shifting statute" in Cooter & Gell, the reasoning of that case does not apply in the context of the bad faith exception because Rule 11 and the bad faith exception are simply "apples and oranges". Any such implication is belied by Chambers v. NASCO, Inc., supra at 53:

> In our recent decision in Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S., at 553, 111 S.Ct., at 934, we stated, "Rule 11 sanctions do not constitute the kind of fee shifting at issue in Alyeska [because they] are not tied to the outcome of litigation; the relevant inquiry is whether a specific filing was, if not successful, at least well founded." Likewise, the imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation. * * * [Alteration in original; emphasis added.]

See also id. at 46 n.10 ("the bad-faith exception resembles the third prong of Rule 11's certification requirement, which mandates that a signer of a paper filed with the court warrant that the paper 'is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation'"). Counsel's emphasis on the differences between Rule 11 and the bad faith exception is devoid of any explanation of how those differences are relevant to the issue at hand: whether the Supreme Court's reasoning regarding appellate fees in the context of Rule 11 sanctions applies to bad faith sanctions as well.

--Brown v. Sullivan

As counsel again relies on Brown v. Sullivan, 916 F.2d 492 (9th Cir. 1990), we take this opportunity to explain further our earlier skepticism. In Brown, the District Court had initially held that the Government had acted in bad faith and that Ms. Brown was therefore entitled to attorneys' fees under 28 U.S.C.

- 6 -

sec. 2412(b), which does not contain any rate caps.[6]  The
Government appealed the award, and the Court of Appeals vacated
and remanded for reconsideration of the bad faith issue in light
of an intervening Ninth Circuit case.  On remand, the District
Court awarded fees to Ms. Brown as a prevailing party under 28
U.S.C. sec. 2412(d).  As a fee-shifting provision, 28 U.S.C. sec.
2412(d) does not require a showing of bad faith or other
misconduct, but, like section 7430, it subjects fee awards to
hourly rate caps.  Ms. Brown appealed that award, arguing that
the Government had indeed acted in bad faith and that her fee
award should therefore be predicated on the bad faith exception,
as applicable to the Government pursuant to 28 U.S.C. sec.
2412(b), rather than the fee-shifting (prevailing party)
provision of 28 U.S.C. sec. 2412(d).  Ms. Brown also sought
additional fees "for bringing and appealing the present fees
motion."  916 F.2d at 493.

Holding that the Government had acted in bad faith, the
Court of Appeals remanded the case to the District Court "so that
it may exercise its discretion to award attorney fees to Brown at
reasonable market rates under 28 U.S.C. § 2412(b)."  916 F.2d at
493.  The court then stated: "The district court may award
attorney fees at market rates for the entire course of the
litigation, including time spent preparing, defending, and
appealing the two awards of attorney fees, if it finds the fees
incurred during the various phases of the litigation are in some
way attributable to the [Government's] bad faith."  Id.  The
court did not attempt to reconcile that statement with Cooter &
Gell v. Hartmarx Corp., supra; rather, it cited as analogous
authority Commissioner, INS v. Jean, supra, a case involving 28
U.S.C. sec. 2412(d) (court need not make a separate inquiry under
that provision as to whether the Government's position in the fee
litigation is substantially justified).  See 916 F.2d at 497.

In Lockary v. Kayfetz, 974 F.2d 1166 (9th Cir. 1992), the
Court of Appeals addressed the issue of whether a fee award under
the bad faith exception properly includes the cost of "preparing
and supporting [the] motion for sanctions".  Id. at 1177.
Interestingly (in light of Brown v. Sullivan, supra), the court
viewed the issue as one of first impression in the Ninth Circuit.
After discussing cases from other jurisdictions, the court
stated:

_____

    [6] Pursuant to 28 U.S.C. sec. 2412(b), the common law
exceptions to the American rule, see supra note 2, including the
bad faith exception, "apply to the federal government in the same
manner as they apply to private litigants."  Maritime Mgmt., Inc.
v. United States, 242 F.3d 1326, 1331 (11th Cir. 2001); see also
Brown v. Sullivan, 916 F.2d at 495.

The Supreme Court's recent decision in <u>Cooter &</u>
<u>Gell v. Hartmarx Corp</u>. fortunately provides some
guidance on this issue. The Court held that the party
who sought sanctions under Rule 11 was not entitled to
reimbursement for the costs of defending an award of
sanctions on appeal. The Court rejected the argument
that such costs were incurred "because of" the
sanctioned party's filing of the offending pleading.
The court refused to adopt the position of the party
seeking sanctions that "[it] would have incurred none
of [its] appellate expenses had petitioner's lawsuit
not been filed." <u>Cooter & Gell</u>, 496 U.S. at 406, 110
S.Ct. at 2461. The court found that "[t]his line of
reasoning would lead to the conclusion that expenses
incurred "because of" a baseless filing extend
indefinitely. * * *

<u>Cooter & Gell</u> suggests that the trial court should
limit sanctions to the opposing party's more "direct"
costs, that is, the costs of opposing the offending
pleading or motion. We thus find that the district
court erred in including the defendants' attorneys'
fees for preparing their motion for sanctions in the
sanctions it imposed.

<u>Id.</u> at 1177-1178.[7] The foregoing strongly suggests that the
<u>Lockary</u> court disavowed, sub silentio, the language in <u>Brown v.</u>
<u>Sullivan</u>, <u>supra</u>, relied upon by counsel.[8]

The <u>Brown</u> court also cited <u>General Federation of Women's</u>
<u>Clubs v. Iron Gate Inn, Inc.</u>, 537 A.2d 1123 (D.C. App. 1988), as
direct authority for the proposition that a court may award fees
incurred over "the entire course of the litigation * * * if it
finds the fees incurred during the various phases of the
litigation are in some way attributable to the [Government's] bad
faith." See 916 F.2d at 497. In particular, the <u>Brown</u> court
quoted the following statement from <u>General Federation</u>, 537 A.2d
at 1129: "The law is well established that, when fees are
available to the prevailing party, that party may also be awarded

---

[7] Although <u>Lockary v. Kayfetz</u> did not involve a Rule 11
sanction, we note that Rule 11 now explicitly authorizes the
awarding of fees and expenses incurred in "presenting or
opposing" the motion for sanctions. Fed. R. Civ. P. 11(c)(1)(A).

[8] Again, we note that two of the three judges comprising the
<u>Brown</u> panel also sat on the panel that subsequently decided
<u>Lockary</u>.

fees on fees, i.e., the reasonable expenses incurred in the recovery of its original costs and fees." In support of that statement, the court in General Federation cited Copeland v. Marshall, 641 F.2d 880, 896 (D.C. Cir. 1980), in which the Court of Appeals stated that "time spent litigating the fee request is itself compensable". Copeland, however, involved an award under the fee-shifting (prevailing party) provision of Title VII of the Civil Rights Act of 1964, rather than a fee sanction. See 42 U.S.C. sec. 2000e-5(k). Similarly, the three cases cited by the court in Copeland in support of its statement quoted above (Johnson v. State of Mississippi, 606 F.2d 635 (5th Cir. 1979), Gagne v. Maher, 594 F.2d 336 (2d Cir. 1979), and Lund v. Affleck, 587 F.2d 75 (1st Cir. 1978)) all involved the Civil Rights Attorney's Fees Awards Act of 1976, another fee-shifting statute. See 42 U.S.C. sec. 1988. Thus, the seeming disconnect in Brown goes well beyond the court's citation to Commissioner, INS v. Jean, supra.

Counsel also cites Chambers v. NASCO, Inc., supra, and Kendrick v. Zanides, 609 F. Supp. 1162 (N.D. Cal. 1985), as being in accord with Brown's statement regarding appellate fees under the bad faith exception. Mot. par. 11. Counsel points to the following language from Chambers, 501 U.S. at 55: "we find that the District Court acted within its discretion in assessing as a sanction for Chambers' bad-faith conduct the entire amount of NASCO's attorney's fees". We direct counsel's attention to Part I of the Chambers opinion, in which the Court, while characterizing the District Court's fee award as representing "the entire amount of NASCO's litigation costs paid to its attorneys", notes that the District Court, in calculating that award, deducted the amount of fees the Court of Appeals had previously awarded under Fed. R. App. P. 38. 501 U.S. at 40 & n.5. As for Kendrick, we note that (1) the opinion makes no reference to any appellate proceedings in that case or to appellate fees in general, and (2) in any event, it is a Rule 11 case that predates Cooter & Gell.

Counsel claims that "Brown does not stand alone in ruling that when a party prevails against the United States on appeal, such party is entitled to fees on appeal under [sic] 28 U.S.C. § 2412(a)." Mot. par. 13. We note that the cited provision deals with costs, "not including the fees and expenses of attorneys". 28 U.S.C. sec. 2412(a)(1). Counsel must be referring to 28 U.S.C. sec. 2412(d), the fee-shifting (prevailing party) provision of the Equal Access to Justice Act, since both of the cases cited by counsel in support of its assertion involve that provision. See United States v. Real Property Known as 22249 Dolorosa St., 190 F.3d 977 (9th Cir. 1999); Meinhold v. United States Dept. of Defense, 123 F.3d 1275 (9th Cir. 1997). Again, we submit that such cases are not in point, given the Supreme

Court's statement in Cooter & Gell that "the policies for
allowing district courts to require the losing party to pay
appellate, as well as district court attorney's fees" are
applicable to fee-shifting statutes but not Rule 11, 496 U.S. at
409, which, like the bad faith exception but unlike a fee-
shifting statute, punishes bad conduct.

--Commissioner, INS v. Jean

We have no quarrel with counsel's description of
Commissioner, INS v. Jean, 496 U.S. 154 (1990); rather, we reject
counsel's attempt to extend the reasoning of that case to the
cases at bar. See Mot. par. 14. Indeed, the language quoted by
counsel undermines that attempt: "While the parties' postures on
individual matters may be more or less justified, the EAJA--like
other fee-shifting statutes--favors treating a case as an
inclusive whole, rather than as atomized line-items." 496 U.S. at
161-162 (emphasis added). One week after the issuance of Jean,
the Supreme Court stated that "the policies for allowing district
courts to require the losing party to pay appellate, as well as
district court attorney's fees" are applicable to fee-shifting
statutes but not Rule 11. Cooter & Gell v. Hartmarx Corp., 496
U.S. at 409. The bad faith exception is not a fee-shifting
provision within the meaning of either Jean or Cooter & Gell.

--Direct Causation

Counsel contends that, because the Court of Appeals' mandate
in DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994),
contemplates the possibility of future appeals, "petitioners'
second appeal to the Ninth Circuit followed directly from
DuFresne with respect to the underlying merits litigation--the
misconduct of respondent's attorneys." Mot. par. 15.
Irrespective of the merits of that contention in the abstract, we
believe counsel misses the point. The issue is whether a trial
court's fee award premised "not on which party wins the lawsuit,
but on how the parties conduct themselves during the litigation",
Chambers v. NASCO, Inc., 501 U.S. at 53, may include fees
incurred on appeal, notwithstanding the lack of any misconduct at
the appellate level. We have concluded that it may not.

We believe Hutto v. Finney, 437 U.S. 678 (1978), provides
additional support for our conclusion. In Hutto, the State of
Arkansas argued that fee awards ordered by the District Court and
the Court of Appeals violated the Eleventh Amendment. Analyzing
the fee awards separately, the Supreme Court found that, whereas
the trial court's award was adequately supported by its finding
of bad faith, the appellate court's award, clearly not supported
by any finding of bad faith, could be sustained under the Civil
Rights Attorney's Fees Awards Act of 1976 (CRAFAA), a fee-

shifting (prevailing party) statute. <u>Id.</u> at 689 & n.13, 693 & n.21; see also <u>id.</u> at 699 n.32, 700 (CRAFAA authorizes a fee award even though the appeal was not taken in bad faith; no indication in this case that the defendants litigated in bad faith before the Court of Appeals); <u>id.</u> at 714 (Rehnquist, J., dissenting) (restating the majority's conclusion that "the award of fees in the Court of Appeals, <u>where there was no bad faith</u>, is authorized by [CRAFAA]" and dissenting on Eleventh Amendment grounds) (emphasis added). Logically, if a finding of bad faith at the trial level could, in and of itself, support a subsequent appellate fee award, the Supreme Court in <u>Hutto</u> would not have had to rely on CRAFAA as the basis for the appellate fee award.

--Additional Cases Cited in September 1 Order

Counsel alternatively argues that "[t]he 'directly caused' element of the <u>Cooter & Gell</u> analysis is specific to Rule 11 sanctions", Mot. par. 15, and then attacks our reliance on cases applying that approach outside the context of Rule 11, see Mot. pars. 16-18. Most notably, counsel asserts that <u>Lockary v. Kayfetz</u>, <u>supra</u>, "while decided under the court's inherent power, was not decided under the 'bad faith exception' and thus is inapposite." Mot. par. 16. We direct counsel's attention to <u>Chambers v. NASCO, Inc.</u>, <u>supra</u> at 45-46:

> Indeed, "[t]here are ample grounds for recognizing
> * * * that in narrowly defined circumstances federal
> courts have inherent power to assess attorney's fees
> against counsel," even though the so-called "American
> Rule" prohibits fee shifting in most cases. As we
> explained in <u>Alyeska</u>, these exceptions fall into three
> categories. * * *
>
> Third, and most relevant here, a court may assess
> attorney's fees when a party has "'acted in bad faith,
> vexatiously, wantonly, or for oppressive reasons.'" In
> this regard, if a court finds "that fraud has been
> practiced upon it, or that the very temple of justice
> has been defiled," it may assess attorney's fees
> against the responsible party, as it may when a party
> "shows bad faith by delaying or disrupting the
> litigation or by hampering enforcement of a court
> order" * * * . [Citations and fn. ref. omitted.]

Clearly, the bad faith exception is subsumed within the broader spectrum of inherent authority fee awards.

Counsel also states that, "[a]s noted above, the Sixth Circuit specifically distinguished <u>Lockary</u> from the bad faith exception in <u>First Bank of Marietta</u>." Mot. par. 16. Far from

distinguishing <u>Lockary</u> from the bad faith exception, the referenced passage from <u>Marietta</u> (Mot. par. 10) <u>identifies</u> <u>Lockary</u> with the bad faith exception:

> In contrast [to the imposition of Rule 11 sanctions], the imposition of inherent power sanctions requires a finding of bad faith. "A court may impose sanctions pursuant to its inherent powers only when it finds the action in question was taken in bad faith," <u>Lockary v.</u> <u>Kayfetz</u>, 974 F.2d 1166, 1174 (9th Cir. 1992) * * * .

<u>First Bank of Marietta v. Hartford Underwriters Ins. Co.</u>, 307 F.3d 501, 517 (6th Cir. 2002).

Counsel's attempt to diminish the significance of <u>Manion v.</u> <u>American Airlines</u>, <u>supra</u>, is equally deficient. According to counsel, our description of <u>Manion</u>'s holding ("fee award under 28 U.S.C. § 1927 does not properly include the cost of defending the award on appeal") is incorrect:

> But this is not the ruling of <u>Manion</u>. What <u>Manion</u> ruled was that 26 [sic] U.S.C. § 1927 does not "permit compensation for litigation costs relating to his interlocutory appeal." Id. at 433. It is not clear in <u>Manion</u> which "interlocutory appeal" is being referred to. * * *

Mot. par. 18. Counsel fails to mention the citation immediately following the quoted language from <u>Manion</u>: "See Appellant's Br. 23-25." Page 23 of the cited brief (easily accessible electronically) refers to fees relating to an interlocutory appeal and a petition for mandamus and then directs the reader to page 7 of the brief. Page 7 of the brief, in turn, refers to "fees relating to the interlocutory appeal that had been filed to challenge the sanctions award".

> Undeterred, counsel goes on to state:

> But the D.C. Circuit also noted: "[t]his court denied <u>Manion's</u> [sic] motion for sanctions, pursuant to Rule 38 of the Federal Rules of Appellate Procedure, for the interlocutory appeal of the sanctions award." Id. In other words, the D.C. Circuit apparently denied a motion under Fed. R. App. P. 38 because it determined the appeal was not frivolous. This ruling does not accord with <u>Cooter & Gell</u> which was decided entirely under Rule 11, not Fed. R. App. P. 38.

Mot. par. 18. Here, counsel erroneously focuses on the action <u>not</u> taken by the Court of Appeals under Fed. R. App. P. 38 rather

- 12 -

than the challenged action of the District Court under 28 U.S.C. sec. 1927.  The relevant point is that, as is the case with a Rule 11 sanction, when a district court awards attorneys' fees under 28 U.S.C. sec. 1927, it "oversteps its bounds when it sanctions conduct before the appellate court that the appellate court itself has the authority to sanction under the appellate rules."  <u>Manion v. American Airlines</u>, <u>supra</u> at 433 (citing <u>Cooter & Gell</u>).

--Practical Consequences

Counsel argues that our September 1 Order "asserts a rule whereby * * * no costs are recoverable for bringing the government to justice" unless "the fraud victims happened to prevail in the trial court".  Mot. par. 20.  First, the September 1 Order places no restrictions on the recovery of fees incurred at the trial level.  Second, the Order does not preclude the recovery of fees incurred at the appellate level; it merely subjects that recovery to the strictures of section 7430 when the bad faith does not extend to the appellate proceedings.  Third, our conclusion would apply equally to the situation where the fraud victim prevails at trial and incurs additional fees defending that victory on appeal.[9]

--Respondent's Position

Quoting from respondent's Opening Brief with regard to the second evidentiary proceedings in this Court, counsel asserts that "there is no disagreement between the parties here that the bad faith exception is applicable in these proceedings."  Mot. par. 21.  Counsel fails to mention that respondent was referring to fees "for work done in connection with the subject evidentiary hearings."  Resp. Br. at 129.

Premises considered, it is

ORDERED that the PH petitioners' motion for reconsideration of our Order dated September 1, 2005 is hereby DENIED.  It is further

ORDERED that petitioners comply with our Order dated September 1, 2005 by December 15, 2005.  It is further

ORDERED that, in addition to counsel for petitioners and respondent, a copy of this order shall be served upon:

---

[9] Of course, the Court of Appeals could award appellate attorneys' fees as a sanction in that situation if the Government's appeal were frivolous.  See Fed. R. App. P. 38.

- 13 -

Joe Alfred Izen, Jr., Esq.
5222 Spruce Street
Bellaire, TX 77401

Declan J. O'Donnell, Esq.
499 S. Larkspur Drive
Castle Rock, CO  80104

Robert Alan Jones, Esq.
1061 E. Flamingo Rd., Ste. 7
Las Vegas, NV  89119

Robert Patrick Sticht, Esq.
P.O. Box 49457
Los Angeles, CA  90049


Renato Beghe
Judge


Dated: Washington, D.C.
       November 18, 2005